UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

ROBERT LOWINGER, Individually and On Behalf
of All Others Similarly Situated,

                       Plaintiff,

            -against-

GLOBAL CASH ACCESS HOLDINGS, INC.,
KIRK SANFORD, KARIM MASKATIYA,
ROBERT CUCINOTTA, M&C INTERNATIONAL,
SUMMIT PARTNERS, L.P., GOLDMAN SACHS &
CO., INC., and J.P. MORGAN SECURITIES, INC.,

                Defendants.

---------------------------------------------------------------- x

Index No. 08 CV 3516

DECLARATION OF DARRYL P. RAINS IN SUPPORT OF DEFENDANTS' MOTION TO TRANSFER TO THE DISTRICT OF NEVADA

I, Darryl P. Rains, declare as follows:

1.      I am an attorney licensed to practice law in the State of California.  I am a partner in the law firm of Morrison & Foerster LLP, counsel for defendants Global Cash Access Holdings, Inc. ("Global Cash Access" or "the company"), Kirk Sanford, Karim Maskatiya, Robert Cucinotta, M&C International, and Summit Partners, L.P. (collectively, "Defendants") in this action.  I submit this declaration in support of Defendants' Motion to Transfer to the District of Nevada.  I make this declaration based on personal knowledge, except for those matters stated on information and belief.  If called as a witness, I would testify to the facts set forth below.

2.      On December 12, 2007, a shareholder derivative action captioned *Stueve v. Sanford et al.*, Case No. 2:07-cv-01659, was filed in the District of Nevada against nominal defendant Global Cash Access and eleven of its current and former directors and officers – including Kirk Sanford, Karim Maskatiya, and Robert Cucinotta.

3.      On February 8, 2008, a shareholder derivative action captioned *Mollenkopf v. Kortschak*, Case No. 2:08-cv-00171, was filed in the District of Nevada against nominal defendant Global Cash Access and the same eleven directors and officers.

4.      On March 6, 2008, Judge James C. Mahan of the District of Nevada ordered these actions (*Stueve* and *Mollenkopf*) related and consolidated for all purposes, and captioned as follows:  *In re Global Cash Access Holdings, Inc. Derivative Litigation*, Lead Case No. 2:07-cv-01659-JCM-PAL.

5.      Attached as Exhibit A is a true and correct copy of the consolidated complaint filed in *In re Global Cash Access Holdings, Inc. Derivative Litigation* ("Consolidated Derivative Action") on May 5, 2008.  The Consolidated Derivative Action names as defendants the same eleven, current and former Global Cash Access directors and officers as the constituent actions – including Kirk Sanford, Karim Maskatiya, and Robert Cucinotta – and, nominally, Global Cash Access.

6.      Defendants' responses to the Consolidated Derivative Action are due June 19, 2008.

7.      Global Cash Access has always managed its business through its Las Vegas, Nevada headquarters.  At the time of its initial public offering, the company's entire management team was based in Las Vegas.  The company's current management team is also based in Las Vegas.

8.      About half of Global Cash Access's over 500 employees are based in Las Vegas.  None are, or ever were, based in New York.  Employees not based in Las Vegas are almost all hourly-wage cashiers that operate check cashing and cash advance booths.  These employees have no role in the calculation and payment of commissions or transaction reporting.

9.      Global Cash Access's accounting and financial reporting staff is, and always has been, located at Global Cash Access's headquarters.

10.     Global Cash Access calculates and pays commissions and reports transactions from its Las Vegas headquarters.  Documents relevant to commissions and transaction reporting are located there.

11.     Documents relating to internal controls and customer contracts are located at Global Cash Access's headquarters.

12.     The company calculates its costs of revenues, conducts its financial analysis for purposes of public reporting, and prepares its financial reports at its headquarters.

13.     Global Cash Access maintains its accounting records and financial database at its headquarters.

14.     Global Cash Access maintains its corporate books and records at its headquarters.

15.     Global Cash Access prepares and issues its press releases and periodic filings from its headquarters.  Documents relevant to these company statements are located there.

16.     Global Cash Access's conference calls originate from Global Cash Access's headquarters.  Documents relevant to these company statements are located there.

17.    Global Cash Access's registration statement and prospectus issued from Global Cash Access's Las Vegas headquarters.  They were prepared at the company's Las Vegas headquarters and at the Palo Alto, California, offices of the law firm of Morrison & Foerster LLP.  Morrison & Foerster attorneys acted as counsel for Global Cash Access in its initial public offering.  Documents relevant to the registration statement and prospectus are located in Las Vegas, Nevada, and Palo Alto, California.

18.    Many present and former Global Cash Access employees were involved in the company's initial public offering or have been involved in the calculation and payment of commissions, the preparation of financial statements, and the design of Global Cash Access's internal controls.  These potential non-party witnesses – employees in accounting, audit, compliance, customer relations, finance, and sales, as well as the company employees involved in the due diligence process and with drafting the registration statements and prospectuses – are, almost without exception, located in or around Las Vegas.  Nevada is a much more convenient forum for them and is the location in which they are subject to the subpoena power of a federal court.  The company is not aware of any potential non-party witnesses, let alone any vital witnesses, who are located in New York.

19.    Deloitte & Touche LLP is Global Cash Access's independent registered public accounting firm and has served in that role since before Global Cash Access's initial public offering.  The Deloitte & Touche office responsible for auditing and reviewing Global Cash Access's financial statements is located in Las Vegas, Nevada.  Deloitte & Touche audited the financial statements included in Global Cash Access's prospectus from its Las Vegas office.

20.    Defendant Kirk Sanford resides in Nevada.  Defendants Karim Maskatiya and Robert Cucinotta reside in Florida.

21.    Defendant Karim Maskatiya was a member of Global Cash Access's board of directors and co-chairman until May 7, 2008.  Defendant Robert Cucinotta was a Global Cash Access board member until May 20, 2008.

22.     M&C International is a Nevada corporation based in San Jose, California. Summit Partners, L.P. is an investment fund with offices in Boston, Palo Alto, and London. Two of Summit's managing directors – Walter Kortschak and Charles J. Fitzgerald – who manage certain Summit investments from its Palo Alto office, have sat on Global Cash Access's board since before Global Cash Access's initial public offering. Neither M&C International nor Summit Partners has a presence in or connection to New York.

23.     Goldman Sachs & Co. and J.P. Morgan Securities, Inc. are large, global investment banking and securities firms that are based in New York City. They played no role in the calculation or payment of commissions to Global Cash Access customers. Neither entity opposes the present motion to transfer this action to the District of Nevada.

24.     On information and belief, based on a review of publicly available information, plaintiff Robert Lowinger filed suit in Las Vegas in the 8th Judicial District Court for Clark County, Nevada, against Mandalay Resort Group (*Lowinger v. Bannen*, Case No. A486782) on June 7, 2004.

25.     On information and belief, based on a review of publicly available information and Certification Of Plaintiff filed in this action, plaintiff also has been a plaintiff in several other securities cases, including suits in California, Connecticut, New York, North Carolina, Pennsylvania, and Texas. *See, e.g.*, *Kihle v. Oracle Corporation*, Lead Case No. 403136, California Superior Ct., San Mateo County, filed December 18, 1997; *Lowinger v. Century Communications Corp., et. al.*, Case No. CV-99-0171092, Superior Court of Connecticut, Judicial District of Stamford/Norwalk, filed March 10, 1999; *Lowinger v. Reckson Associates Realty Corp.*, Case No. 012524/06, New York State Supreme Court, Nassau County, filed August 4, 2006; *Rapoport, et al. v. Asia Electronics, et al.*, Case No. 1:98-cv-05785-DNE (S.D.N.Y.), filed August 13, 1998; *Lowinger v. Johnson, et al.*, Case No. 3:05-cv-00316-FDW-CH (W.D.N.C.), filed June 6, 2005 (originally filed in the General Court of Justice, Superior Court Division, of the State of North Carolina) (Fairpoint Communications, Inc.); *Lowinger v. Rigas, et al.*, Case No. 2:02-cv-6690-HH (E.D. Pa), filed August 9, 2002 (regarding Adelphia

Communications); *In re FirstPlus Financial Group, Inc. Sec. Lit.*, Case No. 3:98-cv-02551 (N.D. Tex.), filed October 29, 1998.

26. The District of Nevada is substantially less congested than the Southern District of New York. In particular, as of September 30, 2007, the average judge in the Southern District of New York presided over 885 cases, while the average judge in the District of Nevada presided over 483. *See* Administrative Office of the United States Courts, *Federal Court Management Statistics* ("FCMS"), available at http://www.uscourts.gov/cgi-bin/cmsd2007.pl (last visited Apr. 30, 2008). Also, only 5.2% of civil cases in the District of Nevada were more than three years old, compared to 11.3% in the Southern District of New York. *See id.*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 5, 2008 in Palo Alto, California.

_____
Darryl P. Rains

# EXHIBIT  A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

IN RE GLOBAL CASH ACCESS, HOLDINGS, INC. DERIVATIVE LITIGATION

This Document Relates to:

    ALL ACTIONS

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Lead Case No. 2:07-cv-01659-JCM-PAL

VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, WASTE OF CORPORATE ASSETS AND UNJUST ENRICHMENT

DEMAND FOR JURY TRIAL

Plaintiffs David Stueve ("Stueve") and Vicki E. Mollenkopf ("Mollenkopf") (collectively, "Plaintiffs"), by their undersigned attorneys, submit this Verified Consolidated Shareholder Derivative Complaint against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.       The is a consolidated shareholder derivative action brought by shareholders of Global Cash Access Holdings, Inc. ("GCA" or the "Company") on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state law, including breaches of fiduciary duties, waste of corporate assets, and unjust enrichment that occurred between December 2006 and the present (the "Relevant Period") and that have caused substantial monetary losses to GCA and other damages, such as to its reputation and goodwill.

2.       GCA is a provider of cash access products and related services to the gaming industry. In providing these services, GCA generates significant costs in the form of commissions paid to gaming establishments. By December 31, 2006 (at the latest), defendants knew that GCA's internal controls were materially deficient such that commissions could not be accurately tracked. Thus, throughout the Relevant Period, defendants subjected GCA to material risks with respect to how the Company reported earnings and costs.

3.       On February 6, 2007, despite GCA's defective internal controls, the Company's Board of Directors ("Board") authorized the repurchase of up to $50 million worth of the Company's own shares. During the Relevant Period, the Company repurchased approximately $27.8 million worth of its own shares under this authorization.

4.       The members of GCA's Audit Committee were well aware of GCA's materially deficient internal controls and endemic problems in this regard (some of which were disclosed in an Annual Report) and they failed to remedy these issues. Indeed, throughout most of 2007, GCA underpaid commissions to its various customers.

5.       This issue remained hidden, however, until a whistle-blower alleged that *the Company was improperly coding particular transactions to avoid paying commissions.* The whistle-blower made these allegations in early November 2007, but defendants did not reveal any details concerning the allegations until December 7, 2007. On that day, defendants held an investor

conference call in which it was revealed that GCA would need to expend *$10 million* to resolve the commission issues and to finally correct the Company's defective internal controls.

6.　　In the wake of these disclosures, the Company's stock price declined from over $15 per share to below $5.50 per share—*a $913 million market capitalization loss*.

7.　　Moreover, certain of the defendants sold over $6 million worth of their personally held shares while in possession of material, non-public information. The majority of these sales coincided with the Board's February 2007 authorization of the repurchase of $50 million of GCA's stock and the release of positive financial results.

8.　　Making matters worse, the Board permitted the members of the Audit Committee— the individuals who bore the most responsibility for GCA's defective internal controls—to investigate their own misconduct. Unsurprisingly, the Audit Committee concluded that there was "no evidence of fraud or intentional misconduct."

9.　　Nevertheless, GCA recorded $2.6 million in additional commission expenses to cover "potential disputes" with customers unsatisfied with the Audit Committee's so-called "investigation." Further, defendants disclosed that "[i]t is reasonably possible that we will be required to pay additional amounts to settle commission disputes related to our reporting of commissionable transactions." The Audit Committee's investigation cost the Company *$4.3 million.*

### JURISDICTION AND VENUE

10.　　This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2) because complete diversity exists between the plaintiffs and each defendant, and the amount in controversy exceeds $75,000. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

11.　　This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

12. Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) GCA maintains its principal place of business in the District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to GCA occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

13. Plaintiff Stueve is and was, at times relevant hereto, an owner and holder of GCA common stock. Stueve is a citizen of Minnesota.

14. Plaintiff Mollenkopf is and was, at times relevant hereto, an owner and holder of GCA common stock. Mollenkopf is a citizen of Idaho.

15. Nominal defendant GCA is a Delaware corporation with executive offices located at 3525 East Post Road, Suite 120, Las Vegas, Nevada. According to its public filings, GCA provides cash access products and related services to the gaming industry.

16. Defendant Kirk Sanford ("Sanford") was a director of GCA from March 2005 to October 2007 and was the Company's President and Chief Executive Officer ("CEO") from 1999 to October 2007. Sanford was also GCA's Executive Vice President of Sales, Marketing and Product Development from 1998 to 1999. Because of Sanford's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of GCA including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Sanford participated in the issuance of improper statements, including the preparation of the improper press releases and Securities and Exchange Commission ("SEC") filings and approval of other statements made to the press, securities analysts and GCA shareholders. Defendant Sanford received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | Non-Equity Incentive Plan Compensation | All Other Compensation |
|---|---|---|---|---|---|---|
| 2007 | $297,500 | - | $3,280,000 | - | $364,792 | $4,988,038 |
| 2006 | $297,500 | - | $3,672,472 | - | $350,000 | $9,969 |
| 2005 | $285,586 | $300,000 | - | 1,444,430 | - | $22,282 |

Defendant Sanford sold 149,306 shares of GCA stock for $1,661,876.24 in proceeds while in possession of material non-public information. Upon information and belief, defendant Sanford is a citizen of Missouri.

17.     Defendant Scott H. Betts ("Betts") has served as GCA's President, CEO, and Secretary, and has also been a director of the Company since October 2007. Betts was also GCA's Interim Chief Financial Officer ("CFO") from October 2007 to February 2008. Because of Betts' positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of GCA including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Betts participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and GCA shareholders. Upon information and belief, defendant Betts is a citizen of Colorado. Defendant Betts received the following compensation:

| Fiscal Year | Salary | Restricted Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation |
|---|---|---|---|---|
| 2007 | $57,115 | $4,133,462 | $37,603 | $947 |

18.     Defendant Charles J. Fitzgerald ("Fitzgerald") is a GCA director and has been since June 2004. Fitzgerald is also a member of GCA's Compensation Committee and Nominating and Corporate Governance Committee and has been since 2005. Because of Fitzgerald's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of GCA including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board

meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Fitzgerald participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and GCA shareholders. Defendant Fitzgerald sold 259,000 shares of GCA stock for $4,175,564.20 in proceeds while in possession of material non-public information. Upon information and belief, defendant Fitzgerald is a citizen of California.

19. Defendant Walter G. Kortschak ("Kortschak") has been a director of the Company since June 2004 and has served as Co-Chairman of the Board since 2007. Kortschak is also Chairman of GCA's Compensation Committee and Nominating and Corporate Governance Committee and has been since 2005. Kortschak was a member of GCA's Audit Committee from 2005 to 2006. Because of Kortschak's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of GCA including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Kortschak participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and GCA shareholders. Defendant Kortschak sold 259,400 shares of GCA stock for $4,175,564.20 in proceeds while in possession of material non-public information. Upon information and belief, defendant Kortschak is a citizen of California.

20. Defendant Robert Cucinotta ("Cucinotta") is one of GCA's co-founders and has served as a director of the Company since June 2004. Because of Cucinotta's position, he knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of GCA including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and

committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Cucinotta participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and GCA shareholders. Upon information and belief, defendant Cucinotta is a citizen of Florida.

21.     Defendant Geoff Judge ("Judge") has served as a GCA director and a member of the Audit Committee since September 2006. Because of Judge's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of GCA including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Judge participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and GCA shareholders. Upon information and belief, defendant Judge is a citizen of New York.

22.     Defendant E. Miles Kilburn ("Kilburn") has served as a GCA director since March 2005. Kilburn is also Chairman of GCA's Audit Committee and has been since 2005 and a member of the Compensation Committee and Nominating and Corporate Governance Committee and has been since 2005. Because of Kilburn's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of GCA including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Kilburn participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and GCA shareholders. Upon information and belief, defendant Kilburn is a citizen of Washington.

23. Defendant Karim Maskatiya ("Maskatiya") has served as a director of GCA and as the Board's Co-Chairman since June 2004. Maskatiya also co-founded the Company. Because of Maskatiya's position, he knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of GCA including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Maskatiya participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and GCA shareholders. Upon information and belief, defendant Maskatiya is a citizen of Florida.

24. Defendant Fred C. Enlow ("Enlow") has served as a director of GCA since October 2006. Enlow is also a member of GCA's Audit Committee and has been since August 2007. Because of Enlow's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of GCA including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Enlow participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and GCA shareholders. Upon information and belief, defendant Enlow is a citizen of Arizona.

25. Defendant Harry C. Hagerty, III ("Hagerty") was GCA's Executive Vice President and CFO from July 2004 to July 2007. Because of Hagerty's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of GCA including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, as well as reports

and other information provided to him in connection therewith. During the Relevant Period, Hagerty participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and GCA shareholders. Upon information and belief, defendant Hagerty received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation |
|---|---|---|---|---|---|
| 2007 | $210,000 | - | $1,640,000 | - | $3,140,307 |
| 2006 | $300,000 | - | $1,836,227 | $250,000 | $12,616 |
| 2005 | $307,175 | $300,000 | - | - | $13,655 |

Defendant Hagerty sold 69,553 shares of GCA stock for $1,010,548.39 in proceeds while in possession of material non-public information. Upon information and belief, defendant Hagerty is a citizen of Nevada.

26.     Defendant William H. Harris ("Harris") served as a director of GCA from April 2005 to August 2007. Harris was also a member of the Audit Committee from April 2005 to August 2007. Because of Harris' positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse, non-public information about the business of GCA including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Harris participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and GCA shareholders. Upon information and belief, defendant Harris is a citizen of Nevada.

27.     The defendants identified in ¶¶16-24, 26 are referred to herein as the "Director Defendants." The defendants identified in ¶¶16-17, 25 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶16, 18-19, 25 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

28.     By reason of their positions as officers, directors and/or fiduciaries of GCA and because of their ability to control the business and corporate affairs of GCA, the Individual Defendants owed GCA and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage GCA in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of GCA and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

29.     Each director and officer of the Company owes to GCA and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

30.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of GCA, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with GCA, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations and improper representations of GCA.

31.     Defendants Enlow, Harris, Judge and Kilburn, as members of the Audit Committee had specific duties with respect to the review and approval of GCA's annual and quarterly financial reports, earnings press releases, internal controls and the receipt and investigation of complaints from GCA employees.  These duties are set out in the Audit Committee's charter (the "Audit Committee Charter").

32.     Per the Audit Committee charter, the members of the Audit Committee are responsible for, among other things, assisting Board oversight of: (a) the integrity of the Company's

financial statements; (b) the Company's compliance with legal and regulatory requirements; (c) the Company's independent auditor's qualifications and independence; and (d) the performance of the Company's internal audit function and independent auditors.

33. The Audit Committee's specific duties per the Audit Committee charter include, among other things, the following:

*Financial Statement & Disclosure Matters*

1. Review the policies and procedures adopted by the Company to fulfill its responsibilities regarding the fair and accurate presentation of financial statements in accordance with generally accepted accounting principles and applicable rules and regulations of the SEC and the NYSE;

2. Review any analyses prepared by management and/or the Company's independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including analyses of the effects of alternative generally accepted accounting principles ("GAAP") methods on the financial statements;

3. Review major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies;

4. Discuss policies with respect to risk assessment and risk management, and discuss the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures;

5. Review with the Company's independent auditor, management and internal auditors any information regarding "second" opinions sought by management from an independent auditor with respect to the accounting treatment of a particular event or transaction;

6. Review and discuss with management and the Company's independent auditor the effect of regulatory and accounting initiatives, as well as off-balance sheet arrangements and aggregate contractual obligations, on the Company's financial statements;

7. Review and discuss reports from the Company's independent auditor regarding: (a) all critical accounting policies and practices to be used by the Company; (b) all alternative treatments of financial information within GAAP that have been discussed with management, including ramifications of the use of such alternative disclosures and treatments and the treatment preferred by the independent auditor; and (c) other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences;

- 10 -

8.    Review all certifications provided by the Company's principal executive officer and principal financial officer pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act;

9.    Review and discuss the Company's annual audited financial statements and quarterly financial statements with management and the Company's independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations";

10.   Discuss the Company's earnings press releases (including type and presentation of information), as well as financial information and earnings guidance provided to analysts and ratings agencies;

11.    If deemed appropriate, recommend to the Board that the Company's audited financial statements be included in its annual report on Form 10-K for the last fiscal year;

12.   Prepare and approve the report required by the rules of the SEC to be included in the Company's annual proxy statement in accordance with the requirements of Item 7(d)(3)(i) of Schedule 14A and Item 306 of Regulation S-K;

13.   Meet separately, periodically, with management, with the Company's internal auditors (or other personnel responsible for the internal audit function) and with the Company's independent auditor;

*  *  *

*Matters Regarding Oversight of the Company's Internal Audit Function*

25.   Review the Company's annual audited financial statements with management, including a review of major issues regarding accounting and auditing principles and practices, and evaluate the adequacy and effectiveness of internal controls that could significantly affect the Company's financial statements, as well as the adequacy and effectiveness of the Company's disclosure controls and procedures and management's reports thereon;

26.   Review major changes to the Company's auditing and accounting principles and practices as suggested by the Company's independent auditor, internal auditors or management;

27.   Review the appointment of, and any replacement of, the Company's senior internal auditing executive;

28.   Review the significant reports to management prepared by the Company's internal auditing department and management's responses;

*Matters Regarding Oversight of Compliance Responsibilities*

29.   Advise the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations;

30.   Obtain reports from the Company's management, senior internal auditing executive and independent auditor that the Company's

subsidiaries and foreign affiliated entities are in compliance with applicable legal requirements, including the Foreign Corrupt Practices Act;

31. Establish procedures for: (a) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters; and (b) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters;

32. Review and address any concerns regarding potentially illegal actions raised by the Company's independent auditor pursuant to Section 10A(b) of the Act, and cause the Company to inform the SEC of any report issued by the Company's independent auditor to the Board regarding such conduct pursuant to Rule 10A-1 under the Act;

33. Obtain from the Company's independent auditor assurance that it has complied with Section 10A of the Act;

*Additional Duties & Responsibilities*

34. Review and reassess the adequacy of this Charter annually;

35. Review and assess the performance and effectiveness of the Committee at least annually;

36. Report regularly to the Board, and review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditor, or the performance of the Company's internal audit function;

37. Review with the Company's outside counsel and internal legal counsel any legal matters that may have a material impact on the financial statements, the Company's compliance policies and any material reports or inquiries received from regulators or governmental agencies;

38. Provide oversight and review of the Company's asset management policies, including an annual review of the Company's investment policies and performance for cash and shortterm investments; and

39. Take any other actions that the Committee deems necessary or proper to fulfill the purposes and intent of this Charter.

34. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of GCA, and was at all times acting within the course and scope of such agency.

35. To discharge their duties, the officers and directors of GCA were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the

financial affairs of the Company. By virtue of such duties, the officers and directors of GCA were required to, among other things:

      (a)    refrain from acting upon material inside corporate information to benefit themselves;

      (b)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

      (c)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

      (d)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

      (e)    remain informed as to how GCA conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

      (f)    ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable laws, rules and regulations.

      36.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of GCA, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were

aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period have been ratified by the remaining Individual Defendants who collectively comprised all of GCA's Board during the Relevant Period.

37.      The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions. As a result, GCA has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

38.      In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

39.      During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its business prospects; (ii) enhance the Individual Defendants' executive and directorial positions at GCA and the profits, power and prestige that the Individual Defendants enjoyed as a result of holding these positions; (iii) allow certain of the defendants to sell over $6 million of their personally held shares; and (iii) deceive the investing public, including shareholders of GCA, regarding the Individual Defendants' management of GCA's operations, the Company's financial health and stability, and its future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

40.      The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct during the Relevant Period. During this time, the Individual Defendants

caused the Company to conceal the true fact that GCA was misrepresenting its business prospects and financial results.

41.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' breaches of fiduciary duty, waste of corporate assets and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition and future business prospects.

42.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

43.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## GCA'S KNOWN DEFECTIVE INTERNAL CONTROLS

44.     GCA is a provider of cash access products and related services to the gaming industry. The Company provides access to cash to gaming patrons through automatic teller machine ("ATM") cash withdrawals, credit card cash advances, debit cash advances, check cashing and money transfers.  GCA generates revenues from transaction fees charged to gaming patrons.  GCA's biggest costs to revenues are the commissions that the Company must pay to gaming establishments where ATM, cash advance or check services occur.  Additionally, GCA pays fees to participate in various ATM networks as well as various fees to credit card companies.

45.     The Individual Defendants clearly recognized that commissions were a critical component of GCA's business.  In fact, in a GCA Form 10-Q filed on May 15, 2006 Individual Defendants specifically cited "higher commissions" as a "Risk Factor" related to GCA's business. The filing stated as follows:

*Competition in the market for cash access services is intense which could result in higher commissions or loss of customers to our competitors.*

\* \* \*

Other providers of cash access products and services to gaming establishments have in the past increased, and may in the future continue to increase, the commissions or other incentives they pay to gaming establishments in order to win those gaming establishments as customers and to gain market share. To the extent that competitive pressures force us to increase commissions or other incentives to establish or maintain relationships with gaming establishments, our business and operating results could be adversely affected.

46.     GCA is a "service" business. Its overhead is minimal, and its capital expenditures constitute a small percentage of the Company's overall costs. The Company derives virtually all of its revenues from cash advances and ATM services. GCA must pay commissions and/or fees to their clients in the gaming services industry to generate revenues. The Company's profitability is largely dependent on the costs it incurs in generating revenues, that is, the amount of commission it must pay its customers.

47.     Throughout the Relevant Period, commissions were, overwhelmingly, GCA's largest costs. During the second and third quarters of 2006, the Individual Defendants disclosed the Company's commissions costs as follows:

**August 14, 2006 Third Quarter Form 10-Q**

Cost of Revenues (Exclusive of Depreciation and Amortization). Cost of revenues (exclusive of depreciation and amortization) increased 24.1% from $75.9 million to $94.3 million. ***The largest component of cost of revenues (exclusive of depreciation and amortization) is commissions***, and commissions increased 26.2% in the 2006 quarter as contracts were signed or renewed at higher commission rates than experienced in the 2005 quarter.

**November 14, 2006 Fourth Quarter Form 10-Q**

Cost of revenues (exclusive of depreciation and amortization) increased 26.7% from $81.2 million to $102.8 million. ***The largest component of cost of revenues (exclusive of depreciation and amortization) is commissions,*** which increased 25.8% in the 2006 quarter as contracts were signed or renewed at higher commission rates than experienced in the 2005 quarter.

For 2007, commissions accounted for 72% of the Company's costs. As such, accurately tracking and accounting for commissions to its customers was the key financial metric for GCA's business.

48.     As of December 31, 2006, the Board and management knew that GCA's internal controls were deficient due to a high level of turnover in the Company's finance and accounting

departments. Thus, GCA's finance and accounting departments could not effectively monitor the Company's transactions.

49.     In particular, Individual Defendants knew that the Company was suffering from defective internal controls concerning how it calculated the amount of commissions paid to gaming establishments. Individual Defendants disclosed the following deficiencies in a Form 10-K filed on March 30, 2007:

> The specific material weaknesses identified by management as of December 31, 2006 are described as follows:
>
> - **Ineffective controls related to staffing in finance and accounting**: During 2006, we had a high level of turnover of personnel in our finance and accounting staff, which resulted in certain controls not operating effectively as of December 31, 2006.
>
> This material weakness did not result in a material adjustment to our 2006 consolidated financial statements but did contribute significantly to the following internal control deficiencies each of which is considered to be a material weakness:
>
> - **Ineffective control related to the reconciliation and analysis of accounts**: The control designed to ensure the timely and accurate preparation, review and approval of account analyses and reconciliations did not operate effectively. Specifically, certain reconciliations and analyses were not performed in a timely manner.
>
> - **Ineffective controls related to the financial reporting close process**: Certain controls designed to ensure the timely and accurate preparation, review and approval of our accounts and financial statements did not operate effectively. Specifically, 1) systematic controls were not in place to segregate the preparation and review of journal entries, 2) certain journal entries were not properly reviewed and approved in accordance with Company policy, 3) certain checklists were not maintained or reviewed and approved by appropriate finance and accounting personnel, and 4) we were unable to adhere to our pre-determined closing and reporting calendar.
>
> - **Ineffective controls related to income taxes**: Certain controls designed to ensure the timely and accurate calculation of our provision for income taxes did not operate effectively. Certain matters affecting our income tax provision were not identified on a timely basis by finance and accounting personnel. Further, our process to timely and accurately quantify temporary differences did not operate effectively.
>
> - **Ineffective controls related to the accounts payable process**: Certain controls designed to ensure the timely and accurate disbursement of Company funds did not operate effectively. Specifically, 1) certain disbursements were not properly reviewed for appropriate coding and cut-off and 2) the vendor master file was not

reviewed by finance and accounting management for pertinence and accuracy.

- **Inadequate controls related to commissions**: We did not have appropriate internal control design related to how we calculate the amount of commissions we pay our customers. Specifically, 1) internal controls over commission set-up did not include a comparison of commission rates to contractual terms and 2) there was an ineffective process to determine the appropriate commission type and amount. In addition, some of the databases and applications used to maintain transaction records and perform certain commission computations were maintained by a third party, and appropriate controls to monitor and approve changes and to limit access were not in place.

50.     Thus, it was clear that, no later than March 30, 2007, the Individual Defendants were actually aware of the Company's materially deficient internal controls with respect to how GCA calculated its commissions, the key financial metric for GCA's business. The Company's March 30, 2007 Form 10-K was signed by defendants Sanford, Hagerty, Maskatiya, Cucinotta, Kortschak, Fitzgerald, Kilburn and Harris. Additionally, this Form 10-K was certified under the Sarbanes Oxley Act of 2002 ("SOX") by defendants Sanford and Hagerty.

51.     The SOX certifications signed by defendants Sanford and Hagerty provided as follows:

I, [Kirk E. Sanford/ Harry C. Hagerty], certify that:

1.  I have reviewed this annual report on Form 10-K of Global Cash Access Holdings, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the

effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

## INDIVIDUAL DEFENDANTS' IMPROPER STATEMENTS DURING THE RELEVANT PERIOD

52. The Individual Defendants, by their fiduciary duties of care, good faith and loyalty, owe to GCA and its shareholders a duty to ensure that the Company's financial reporting fairly represented the operations and financial condition of the Company. In order to adequately carry out these duties, it was necessary for the Individual Defendants to know and understand the material, non-public information that should be either disclosed or omitted from the Company's public statements.

53. This material, non-public information principally included GCA's lack of internal controls concerning its transaction fees and commission payments. Further, defendants Enlow, Harris, Judge and Kilburn, as members of the Audit Committee, were specifically charged with understanding this material information as set out in the Audit Committee Charter, which provides that the Audit Committee is responsible for reviewing financial information and earnings guidance provided to analysts and rating agencies.

54. The Officer Defendants had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports. Moreover, the Director Defendants had ample opportunity to discuss this material information with

management and fellow directors at any of the Board meetings that occurred during the Relevant Period, as well as at meetings of committees of the Board. Despite these duties, the Individual Defendants negligently, recklessly and/or intentionally caused or allowed, by their actions or inaction, the following improper statements to be disseminated by GCA to the investing public and the Company's shareholders during the Relevant Period.

55. On February 8, 2007, the Individual Defendants caused or allowed GCA to issue a press release announcing its fiscal year 2006 financial results. For the year, GCA reported net income of $26.6 million. GCA also reported $100.8 million in cost of revenues for the fourth quarter, with commissions amounting to 29.3% of that amount. In particular, the press release provided as follows:

> Global Cash Access Holdings, Inc. ("GCA" or the "Company") today announced preliminary, unaudited financial results for the quarter and year ended December 31, 2006.
>
> Summary Non-GAAP Results
>
> For the quarter ended December 31, 2006, revenues were $141.9 million, an increase of 23.0% over the $115.4 million in revenues recorded in the same quarter last year. Adjusted Cash Earnings were $13.6 million in Q4 2006 as compared to $11.1 million in Q4 2005, an increase of 21.8%. Adjusted Cash Earnings per diluted share were $0.17 in Q4 2006 (on 82.0 million diluted shares) as compared to $0.14 in Q4 2005 (on 81.7 million diluted shares). Adjusted EBITDA was $27.1 million in Q4 2006, an increase of 13.4% from Adjusted EBITDA of $23.8 million in the same period in 2005.
>
> "The fourth quarter of 2006 was a strong finish to a great year in which we met the financial, product and new market targets we set for ourselves," commented Kirk Sanford, President and Chief Executive Officer of GCA. "From a financial perspective, we delivered adjusted cash EPS that was right in line with the guidance we gave at the outset of the year. From a product perspective, we doubled the penetration of 3-in-1 enabled redemption kiosks; received approval for EDITH enabling us to serve much of the large Native American gaming market; and launched the Arriva Card with great customer acceptance and utilization. From a new market perspective, we have positioned ourselves to participate in Macau and Pennsylvania in 2007, and we anticipate announcing entry into other new markets in the first half of 2007."
>
> "In 2006, GCA generated significant free cash flow even in the face of capital expenditures that doubled," said Harry Hagerty, GCA's Chief Financial Officer. "We used much of that free cash flow to pay off nearly $47 million in debt, bringing leverage to 2.6x at year-end. In addition, we refinanced our remaining bank debt at lower rates and with improved flexibility."

Recent Highlights

- Recorded revenue of $141.9 million, the highest quarterly total ever recorded by the Company.

- Significant increases in key metrics:

  o Same store surcharge revenue up 11.4%

  o Cash advance dollars disbursed up 21.4%

  o ATM transaction volume up 17.9%.

- Renewed contract with Foxwoods Resort Casino

- Extended contract with Harrah's Entertainment

- 3-in-1 Enabled QuickJack(TM) Plus Redemption Kiosk installations reached 423 as of December 31, 2006.

- Installed seven EDITH kiosks at Casino Pauma.\

- Signed agreement with Galaxy StarWorld, our first customer in Macau.

- Arriva Card rollout continued (statistics as of January 31, 2007):

  o 3,594 accounts

  o $15.4 million in Arriva Card transaction volume

  o Average cash advance transaction amount of $978 vs. $628 on non-Arriva cards.

GAAP Quarterly and Year End Results

For the fourth quarter of 2006, total revenues were $141.9 million, an increase of 23.0% over the fourth quarter of 2005. Operating Income (including non-cash compensation expense) in the fourth quarter of 2006 was $22.2 million, an increase of 4.3% from the same period in 2005. Net income in the fourth quarter of 2006 was $5.6 million, up 34.7% from $4.1 million in the fourth quarter of 2005. Diluted earnings per share were $0.07 in the fourth quarter of 2006 (on 82.0 million diluted shares) as compared to $0.05 in the fourth quarter of 2005 (on 81.7 million diluted shares). Included within interest expense in the fourth quarter is the write-off of $3.4 million of deferred financing costs associated with the Company's senior secured credit facilities. The write-off was triggered by the refinancing entered into in November 2006.

For the year ended December 31, 2006, total revenues were $548.1 million, an increase of 20.7% over 2005. Operating Income (including non-cash compensation expense) in 2006 was $85.2 million, an increase of 3.5% from the same period in 2005. Net income in 2006 was $26.6 million, up 17.8% from $22.6

million in 2005. Diluted earnings per share were $0.32 for 2006 (on 81.9 million diluted shares) as compared to $0.30 for 2005 (on 74.5 million diluted shares).

Fourth Quarter Results of Operations

Total revenues in the fourth quarter of 2006 were $141.9 million, an increase of 23.0% from revenues of $115.4 million in the fourth quarter of 2005. Same store revenues for Cash Advance and ATM surcharge increased 11.4% in the fourth quarter of 2006.

The following is a comparison of selected revenue components for the fourth quarter of 2006 to the same period in 2005:

- Cash advance revenues were up 24.9%, from $60.0 million to $75.0 million. Cash disbursed increased 21.4%, from $1.20 billion to $1.46 billion. The number of transactions increased 14.8%, from 2.3 million to 2.6 million. The average transaction amount increased from $524.40 to $554.37. The average fee increase from 5.00% to 5.14%. Average revenue per transaction increased 8.8% from $26.22 to $28.52.

- ATM revenues increased 20.9%, from $46.7 million to $56.5 million. The number of transactions increased 17.9% from 14.9 million to 17.6 million. Cash disbursed was $3.16 billion compared to $2.57 billion, an increase of 22.8%. Average revenue per transaction increased 2.6% from $3.13 to $3.21.

- Check services revenues were $7.3 million, an increase of 16.7%. The face amount of checks warranted increased by 13.4%, from $289.7 million to $328.4 million. The number of check warranty transactions grew 7.9%, from 1.14 million to 1.23 million. The average face amount per check warranted grew from $254.23 to $267.08, an increase of 5.1%. The average check warranty fee increased from 2.01% to 2.12%. Average check warranty revenue per transaction increased from $5.11 to $5.67.

- Central Credit and other revenues increased 34.2%, from $2.3 million to $3.1 million.

Cost of revenues increased 27.8% in the fourth quarter of 2006 to $100.8 million from $78.9 million in the fourth quarter of 2005. Commissions, the largest component of cost of revenues, increased 29.3%. Interchange increased 25.3%, driven largely by the increase in cash advance volumes.

Operating expenses in the fourth quarter of 2006 were $16.5 million. Operating expenses, excluding non-cash compensation expense, were $14.1 million in the current quarter, an increase of 11.1% from operating expenses of $12.7 million in the fourth quarter of 2005.

Depreciation and amortization expense declined 5.8% from $2.6 million in the fourth quarter of 2005 to $2.4 million in the fourth quarter of 2006.

Interest income was $0.9 million in the fourth quarter of 2006, an increase of 11.1% from the comparable 2005 period.

Interest expense in the fourth quarter of 2006 was $10.2 million as compared to $10.8 million in the fourth quarter of 2005. Interest expense on the Company's borrowings declined $1.4 million due to the lower level of outstanding indebtedness in the fourth quarter of 2006, offset by higher interest rates on the floating rate portion of that indebtedness. Interest expense on the Company's ATM funds increased 27.9% from $3.2 million in Q4 2005 to $4.1 million in Q4 2006, due primarily to increases in the LIBOR rate on which those funds are priced. In the fourth quarter of 2006, we incurred $3.4 million of write-off of deferred financing costs in connection with the refinancing of our senior secured credit facility. In the 2005 quarter, we incurred $9.5 million of such expenses in connection with the early retirement of $82.3 million of the Company's senior subordinated notes.

Income tax expense in the fourth quarter of 2006 was $3.9 million. The Company's provision in the fourth quarter of 2006 is based on an expected effective rate for all of 2006 of 38.8%. The increase in the expected effective rate for the year resulted from the write-off of the deferred financing costs in the fourth quarter.

\* \* \*

Financial Guidance

For the full year of fiscal 2007, the Company currently expects revenues in a range of $641 million to $652 million and adjusted diluted cash EPS in a range of $0.75 to $0.77 per share. This expectation is based on assumed same-store surcharge growth in the range of 9.0% for the year. While recent trends in same store surcharges have been higher, the Company believes it is prudent to forecast the year at levels closer to longer-term historical trends. Also impacting 2007 expectations is an increase in stock-based compensation expense of approximately $0.02 per share and a forecasted loss from Arriva operations of $0.02 per share. The Company expects revenue and earnings to be higher in the second half of the year than in the first, as new business commencement - particularly in Pennsylvania and Macau, will be weighted to the second half of the year.

For the first quarter of fiscal 2007, the Company currently expects revenues in a range of $145 million to $147 million and adjusted diluted cash EPS of approximately $0.17.

Full year and first quarter figures are based on an assumption of 83.0 million diluted shares outstanding. The forecast assumes no share repurchases in 2007.

56.      On or about April 6, 2007, the Individual Defendants caused or allowed GCA to issue a proxy statement to the Company's shareholders.  The proxy statement disclosed that the Audit Committee reviewed major issues regarding GCA's accounting principles and practices and the effectiveness of the Company's internal controls.  The proxy also disclosed that defendant Kilburn acted as the Audit Committee's financial expert.  In particular, the proxy disclosed as follows:

The Audit Committee has reviewed and discussed with management the consolidated financial statements for fiscal year 2006 audited by Deloitte & Touche LLP, the Company's independent registered public accounting firm, and management's

assessment of internal controls over financial reporting. The Audit Committee has discussed with Deloitte &Touche LLP various matters related to the financial statements, including those matters required to be discussed by SAS 61. The Audit Committee has also received the written disclosures and the letter from Deloitte & Touche LLP required by Independence Standards Board Standard No. 1, and has discussed with Deloitte &Touche LLP its independence. Based upon such review and discussions, the Audit Committee recommended to the Board that the audited consolidated financial statements be included in the Company's Annual Report on Form 10-K for the year ended December 31, 2006 for filing with the Securities and Exchange Commission.

57.     The April 6, 2007 proxy statement also disclosed that the Nominating and Corporate Governance Committee had met two times during fiscal year 2006. According to the proxy, at those meetings, the Nominating and Corporate Governance Committee developed and recommended the implementation of a set of corporate governance principles and procedures. The Nominating and Corporate Governance Committee also evaluated the qualifications of the members of the Audit Committee.

58.     On May 9, 2007, the Individual Defendants caused or allowed GCA to issue a press release announcing its first quarter 2007 financial results. The press release announced earnings of $12.2 million for the quarter. Additionally, the press release reported cost of revenues of $106.7 million. Commissions were the largest component of that amount. Defendant Sanford commented in the press release that "[i]n the first quarter of 2007, we maintained strength in our core business while gaining momentum in our new initiatives…." In particular the press release provided as follows:

Global Cash Access Holdings, Inc. ("GCA" or the "Company") today announced unaudited financial results for the quarter ended March 31, 2007.

Summary Non-GAAP Results

For the quarter ended March 31, 2007, revenues were $148.7 million, an increase of 14.6% over the $129.8 million in revenues recorded in the same quarter last year. Adjusted Cash Earnings, which exclude stock-based compensation, were $14.1 million in Q1 2007, an increase of 14.1% over Q1 2006. Adjusted Cash Earnings per diluted share were $0.17 in Q1 2007 as compared to $0.15 in Q1 2006. Cash Earnings, which include stock-based compensation, were $12.2 million in Q1 2007 as compared to $11.1 million in Q1 2006, an increase of 10.5%. Cash Earnings per diluted share were $0.15 in Q1 2007 as compared to $0.14 in Q1 2006. EBITDA (which excludes stock-based compensation) was $27.0 million in Q1 2007, an increase of 7.4% from Q1 2006.

"In the first quarter of 2007, we maintained strength in our core business while gaining momentum in our new initiatives," commented Kirk Sanford, President and Chief Executive Officer of GCA. "We had double-digit revenue growth in our Cash Advance and ATM business while also getting ready for operations in Macau and adding to our Arriva Card cardholder base."

Recent Highlights

--    Recorded revenue of $148.7 million, the highest quarterly total ever recorded by the Company.

--    Significant increases in key metrics:

  --    Same store surcharge revenue up 9.9%

  --    Cash advance dollars disbursed up 14.1%

  --    ATM transaction volume up 13.1%.

--    3-in-1 Enabled QuickJack(TM) Plus Redemption Kiosk installations reached 467 as of March 31, 2007

--    Arriva Card rollout continued (statistics as of March 31, 2007):

  --    5,234 accounts

  --    $21.5 million in Arriva Card transaction volume since the launch of the Arriva Card, with $9.2 million in volume in Q1 2007

  --    Charge-offs to date of $0.2 million

  --    Q1 average cash advance transaction amount of $871 vs. $630 on non-Arriva cards.

--    Established $50 million common stock repurchase authorization

--    Interest rate on senior secured borrowings declined to LIBOR +112.5bp as of April 5, 2007.

GAAP Results

For the first quarter of 2007, total revenues were $148.7 million, an increase of 14.6% over the first quarter of 2006. Operating Income in the first quarter of 2007 was $21.3 million, an increase of 3.4% from the same period in 2006. Net income in the first quarter of 2007 was $7.9 million, up 13.5% from the first quarter of 2006. Diluted earnings per share were $0.10 in the first quarter of 2007 as compared to $0.09 in the first quarter of 2006.

First Quarter Results of Operations

Total revenues in the first quarter of 2007 were $148.7 million, an increase of 14.6% from revenues of $129.8 million in the first quarter of 2006. Same store revenues for cash advance and ATM surcharge increased 9.9% in the first quarter of 2007.

The following is a comparison of selected revenue components for the first quarter of 2007 to the same period in 2006:

--  Cash advance revenues were up 15.4%, from $67.1 million to $77.4 million. Cash disbursed increased 14.1%, from $1.35 billion to $1.54 billion. The number of transactions increased 10.2%, from 2.5 million to 2.8 million. The average transaction amount increased from $536.25 to $555.31. The average fee increased from 4.97% to 5.02%. Average revenue per transaction increased 4.8% from $26.63 to $27.90.

--  ATM revenues increased 14.3% to $60.8 million. The number of transactions increased 13.1% from 16.7 million to 18.9 million. Cash disbursed was $3.40 billion compared to $2.92 billion, an increase of 16.2%. Average revenue per transaction increased 0.9% from $3.19 to $3.22.

--  Check services revenues were $7.4 million, an increase of 1.5%. The face amount of checks warranted increased by 5.3%, from $322.8 million to $340.0 million. The number of check warranty transactions grew 2.5%, from 1.26 million to 1.29 million. The average face amount per check warranted grew from $256.08 to $263.12. The average check warranty fee decreased from 2.02% to 1.98%. Average check warranty revenue per transaction increased from $5.17 to $5.21.

--  Central Credit and other revenues increased 35.3%, from $2.4 million to $3.2 million. Most of the increase is attributable to $0.6 million of interest and fee revenue from the Arriva Card in Q1 2007 vs. $0 in the comparable 2006 quarter.

Cost of revenues (exclusive of depreciation and amortization) increased 16.8% in the first quarter of 2007 to $106.7 million from $91.4 million in the first quarter of 2006. Commissions, the largest component of cost of revenues, increased 17.2%. Interchange increased 15.5%, driven largely by the increase in cash advance volumes.

Operating expenses in the first quarter of 2007 were $17.9 million, an increase of 17.3% over the same period in 2006. Operating expenses, excluding non-cash compensation expense, were $15.0 million in the current quarter, an increase of 12.5% from operating expenses of $13.3 million in the first quarter of 2006. Of the $1.7 million increase in operating expenses (excluding non-cash compensation expense), $0.5 million relates to increases in professional service fees for financial

statement audit and Sarbanes-Oxley Section 404 compliance expenses and $0.2 million relates to increases in operating expenses related to the Arriva Card.

Depreciation and amortization expense was $2.8 million in the first quarter of 2007, an increase of 7.4% from $2.6 million in the first quarter of 2006.

Interest income was $0.9 million in the first quarter of 2007, an increase of 61.4% from the comparable 2006 period.

Interest expense in the first quarter of 2007 was $9.6 million as compared to $10.2 million in the first quarter of 2006. Interest expense on the Company's borrowings declined $1.0 million due to the lower level of outstanding indebtedness and lower interest rates on the floating rate portion of that indebtedness in the first quarter of 2007. Interest expense on the Company's ATM funds increased 10.9% from $3.5 million in Q1 2006 to $3.9 million in Q1 2007, due primarily to increases in the LIBOR rate on which those funds are priced and offset by lower average ATM funds outstanding.

Income tax expense in the first quarter of 2007 was $4.7 million. The Company's provision in the first quarter of 2007 is based on an expected effective rate for all of 2007 of 38.0%.

* * *

Financial Guidance

For the full year of fiscal 2007, the Company currently expects revenues in a range of $643 million to $652 million, adjusted dilute cash EPS in a range of $0.75 to $0.77 per share, and diluted Cash Earnings (including stock compensation expense) in a range of $0.66 to $0.68 per share.

For the second quarter of fiscal 2007, the Company currently expects revenues in a range of $154 to $157 million and adjusted diluted cash EPS of approximately $0.18 and Cash Earnings (including stock compensation expense) of approximately $0.16.

59.     On May 10, 2007, the Individual Defendants caused or allowed GCA to file a quarterly financial report on a Form 10-Q with the SEC. The Form 10-Q reiterated the financial information presented in the May 9, 2007 earnings press release. Additionally, the Form 10-Q disclosed that GCA's internal controls were still not effective as of March 31, 2007 due to the internal control deficiencies identified in GCA's fiscal 2006 Form 10-Q filed on December 31, 2006. Nevertheless, the Form 10-Q represented the following:

Notwithstanding management's evaluation that our disclosure controls and procedures were not effective as of March 31, 2007, we believe that the unaudited

condensed consolidated financial statements included in this Quarterly Report on Form 10-Q *correctly present our financial condition, results of operations and cash flows for the periods covered thereby in all material respects*.

60.    On August 9, 2007, the Individual Defendants caused or allowed GCA to issue a press release announcing its second quarter 2007 earnings.  The press release reported earnings of $12.9 million for the quarter.  Additionally, the press release reported cost of revenues of $109.1 million.  Commissions were the largest component of this amount.  Defendant Sanford commented that "[i]n the second quarter of 2007, we continued to see growth in our core business with double-digit revenue growth in our Cash Advance and ATM business."  In particular, the press release provided as follows:

> Global Cash Access Holdings, Inc. ("GCA" or the "Company") today announced unaudited financial results for the quarter ended June 30, 2007.

> Summary Non-GAAP Results

> For the quarter ended June 30, 2007, revenues were $151.5 million, an increase of 13.4% over the $133.6 million in revenues recorded in the same quarter last year. Adjusted Cash Earnings, which exclude stock-based compensation and other items that typically do not occur on a recurring basis, were $14.3 million in Q2 2007, an increase of 11.2% over Q2 2006. Adjusted Cash Earnings per diluted share were $0.17 in Q2 2007 as compared to $0.16 in Q2 2006. Cash Earnings, which include stock-based compensation, were $12.9 million in Q2 2007 as compared to $10.6 million in Q2 2006, an increase of 21.8%. Cash Earnings per diluted share were $0.16 in Q2 2007 as compared to $0.13 in Q2 2006. EBITDA (which excludes stock-based compensation) was $28.7 million in Q2 2007, an increase of 14.7% from Q2 2006.

> "In the second quarter of 2007, we continued to see growth in our core business with double-digit revenue growth in our Cash Advance and ATM business," commented Kirk Sanford, President and Chief Executive Officer of GCA. "While we continue to expect solid growth in our core business, we are experiencing greater than expected delays in the timing of new business that have tempered our expectations for the second half of the year. With our recent Venetian Macao agreement and continued progress made with several other notable prospects, our business in Macau and other international markets continues to build strong momentum."

> Recent Highlights

> --    Recorded revenue of $151.5 million, the highest quarterly total ever recorded by the Company.

> --    Significant increases in key metrics versus the same quarter in the prior year:

> > --    Same store surcharge revenue up 9.8%

- 28 -

--     Cash advance dollars disbursed up 16.9%

--     ATM transaction volume up 8.9%.

--     3-in-1 enabled Redemption Kiosk installations reached 506 as of June 30, 2007

--     Arriva Card account growth continued (statistics as of June 30, 2007):

      --     7,306 accounts

      --     $30.2 million in Arriva Card transaction volume since the launch of the Arriva Card, with $8.4 million in volume in Q2 2007

      --     Charge-offs to date of $1.0 million

      --     2 average cash advance transaction amount of $791 vs. $571 on non-Arriva cards.

--     Repurchased $5.6 million of common stock under our $50 million common stock repurchase authorization through July 31, 2007

GAAP Results

For the second quarter of 2007, total revenues were $151.5 million, an increase of 13.4% over the second quarter of 2006. Operating Income in the second quarter of 2007 was $22.5 million, an increase of 11.4% from the same period in 2006. Net income in the second quarter of 2007 was $8.6 million, up 36.5% from the second quarter of 2006. Diluted earnings per share were $0.10 in the second quarter of 2007 as compared to $0.08 in the second quarter of 2006.

For the first half of 2007, total revenues were $300.3 million, an increase of 14.0% over the first half of 2006. Operating Income in the first half of 2007 was $43.9 million, an increase of 7.4% from the same period in 2006. Net income in the first half of 2007 was $16.5 million, up 24.4% from the first half of 2006. Diluted earnings per share were $0.20 in the first half of 2007 as compared to $0.16 in the same period of 2006.

Second Quarter Results of Operations

Total revenues in the second quarter of 2007 were $151.5 million, an increase of 13.4% from revenues of $133.6 million in the second quarter of 2006. Same store revenues for cash advance and ATM surcharge increased 9.8% in the second quarter of 2007.

The following is a comparison of selected revenue components for the second quarter of 2007 to the same period in 2006:

--     Cash advance revenues were up 15.3%, from $69.1 million to $79.7 million. Cash disbursed increased 16.9%, from $1.4 billion to $1.6 billion. The number of transactions increased 14.8%, from 2.5 million to 2.9 million. The average transaction amount increased from

$540.94 to $550.73. The average fee decreased from 5.03% to 4.96%. Average revenue per transaction increased 0.4% from $27.18 to $27.29.

-- ATM revenues increased 11.9% to $61.1 million. The number of transactions increased 8.9%, from 17.0 million to 18.5 million. Cash disbursed was $3.4 billion compared to $3.0 billion, an increase of 14.5%. Average revenue per transaction increased 2.8% from $3.22 to $3.31.

-- Check services revenues were $7.5 million, an increase of 0.4%. The face amount of checks warranted increased by 2.6%, from 339.0 million to 347.9 million. The number of check warranty transactions grew 3.3%, from 1.29 million to 1.33 million. The average face amount per check warranted decreased from $263.51 to $261.82. The average check warranty fee decreased from 2.01% to 1.94%. Average check warranty revenue per transaction decreased from $5.29 to $5.07.

-- Central Credit and other revenues increased 35.8%, from $2.4 million to $3.2 million. Most of the increase is attributable to $0.7 million of interest and fee revenue from the Arriva Card in Q2 2007 vs. $0 in the comparable 2006 quarter.

Cost of revenues (exclusive of depreciation and amortization) increased 15.7% in the second quarter of 2007 to $109.1 million from $94.3 million in the second quarter of 2006. Commissions, the largest component of cost of revenues, increased 17.0%. Interchange increased 15.4%, driven largely by the increase in cash advance volumes.

Operating expenses in the second quarter of 2007 were $17.1 million, an increase of 2.6% over the same period in 2006. Operating expenses, excluding non-cash compensation expense and other items that do not occur on a recurring basis, were $14.8 million in the current quarter, an increase of 10.5% from the comparable total of $13.4 million in the second quarter of 2006. This increase is principally related to additional payroll and related benefit costs and higher system maintenance expenses.

Depreciation and amortization expense was $2.9 million in the second quarter of 2007, an increase of 18.3% from $2.4 million in the second quarter of 2006.

Interest income was $1.0 million in the second quarter of 2007, an increase of 17.6% from the comparable 2006 period.

Interest expense in the second quarter of 2007 was $9.7 million as compared to $10.7 million in the second quarter of 2006. Interest expense on the Company's borrowings declined $1.1 million due to the lower level of outstanding indebtedness and lower interest rates on the floating rate portion of that indebtedness in the second quarter of 2007. Interest expense on the Company's ATM funds increased $0.1 million from $4.0 million in Q2 2006 to $4.1 million in Q2 2007, primarily as a result of increases in the LIBOR rate on which those funds are priced and offset by a reduction in the average ATM funds outstanding from $296.0 million in Q2 2006 to $290.5 million in Q2 2007.

Income tax expense in the second quarter of 2007 was $5.3 million. The Company's provision in the second quarter of 2007 is based on an expected full year effective rate of 38.1%.

\* \* \*

Financial Guidance

Several factors have contributed to the Company's decision to lower second half and full year expectations. The Company's existing contract with Mandalay Resorts Group, which expired in May and hereafter falls under the current MGM agreement, will have a greater than expected adverse impact on gross margins. In addition our revenues will be impacted by an unanticipated third quarter loss of a significant customer along with greater than expected delays of previously anticipated new business. We currently expect 2007 revenues in a range of $630 million to $639 million, diluted Adjusted Cash Earnings in a range of $0.70 to $0.72 per share, and diluted Cash Earnings (including stock compensation expense) in a range of $0.58 to $0.60 per share.

For the third quarter of fiscal 2007, the Company currently expects revenues in a range of $160 to $165 million and adjusted diluted cash EPS of approximately $0.17 and Cash Earnings (including stock compensation expense) of approximately $0.12.

61.    On August 14, 2007, the Individual Defendants caused or allowed GCA to file a quarterly financial report on a Form 10-Q with the SEC.  The Form 10-Q reiterated the financial information presented in the August 9, 2007 earnings press release:

During our second quarter ended June 30, 2007, and subsequent thereto, we have completed certain remediation initiatives, which include:

- The hiring of a commission analyst with an auditing background to oversee the commission audit process and the development of automated commission calculations and review tools; and

- Implementation of the accounts payable portion of the new accounting system.

We continue to undertake extensive work to remedy the material weaknesses described above. This includes, but is not limited to, the following remediation initiatives:

- With turnover in 2007 limited to staff level positions, we continue with the hiring of several accounting staff and management positions; and

- Completion of the implementation of a new integrated accounting system and accounts payable system, which enables us to move from manual controls to more automated internal controls.

While management believes progress has been made regarding the implementation of these initiatives, additional procedures and further evaluation are on-going. Remediation of the material weaknesses identified at December 31, 2006, remains a priority for us during fiscal 2007.

Except for the remediation initiatives with respect to the material weaknesses described above and the general ledger system conversion that occurred in the second fiscal quarter, *there have been no changes in our internal control over financial reporting that occurred during our fiscal quarter ended June 30, 2007, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.*

62.     Significantly, the purported "remedial initiatives" touted by Defendants in GCA's August 14, 2007 10-Q were too little, too late.  This is because the "remedial initiatives" failed to adequately address the Company's endemic internal controls deficiencies.  As a result, GCA underpaid its commissions as the Company's shareholders would learn several months later.

63.     On November 7, 2007, the Individual Defendants caused or allowed GCA to issue a press release announcing its financial results for the third fiscal quarter 2007.  The press release reported earnings of $11.3 million.  The press release also reported cost of revenues of $112.5 million.  Commissions were the largest component of this amount.  Defendant Betts commented in the press release that "[t]he company is at the forefront of the cash access industry and is well positioned to deliver continued growth by capitalizing on opportunities both domestically and abroad...".  In particular, the press release provided as follows:

Global Cash Access Holdings, Inc. ("GCA" or the "Company") today announced unaudited financial results for the quarter ended September 30, 2007.

Summary Non-GAAP Results

For the quarter ended September 30, 2007, revenues were $156.6 million, an increase of 9.6% over the $142.9 million in revenues recorded in the same quarter last year.  Adjusted Cash Earnings, which exclude stock-based compensation and items that typically do not occur on a recurring basis, were $15.2 million in Q3 2007, an increase of 11.8% over Q3 2006.  Adjusted Cash Earnings per diluted share were $0.19 in Q3 2007 as compared to $0.17 in Q3 2006.  Cash Earnings, which include stock-based compensation, were $11.3 million in Q3 2007 as compared to $12.2 million in Q3 2006, a decrease of 6.7%.  Cash Earnings per diluted share were $0.14 in Q3 2007 as compared to $0.15 in Q3 2006.  EBITDA (which excludes stock-based compensation) was $29.1 million in Q3 2007, an increase of 7.7% from Q3 2006.

"I am very excited to join the entire team at Global Cash Access.  The company is at the forefront of the cash access industry and is well positioned to deliver continued growth by capitalizing on opportunities both domestically and abroad," commented Scott Betts, President and Chief Executive Officer of GCA.  "I look forward to aggressively pursuing growth initiatives, improving the operational efficiency of the core business and adding significant value for GCA stockholders."

Recent Highlights

- Recorded revenue of $156.6 million, the highest quarterly total ever recorded by the Company.

- Significant increases in key metrics versus the same quarter in the prior year:

  o Same store surcharge revenue up 8.7%

  o Cash advance dollars disbursed up 11.5%

  o ATM transaction volume up 5.2%.

- 3-in-1 enabled Redemption Kiosk installations reached 635 as of September 30, 2007

- Arriva Card account growth continued (statistics as of September 30, 2007):

  o 9,614 accounts

  o $38.8 million in Arriva Card transaction volume since the launch of the Arriva Card, with $8.6 million in volume in Q3 2007

  o Charge-offs to date of $1.9 million

  o Q3 average cash advance transaction amount of $706 vs. $567 consolidated average transaction amount for all cash advance transactions.

- Repurchased $27.9 million of common stock under our $50 million common stock repurchase authorization through October 31, 2007

GAAP Results

For the third quarter of 2007, total revenues were $156.6 million, an increase of 9.6% over the third quarter of 2006. Operating Income in the third quarter of 2007 was $19.8 million, a decrease of 10.6% from the same period in 2006. Net income in the third quarter of 2007 was $6.9 million, down 11.1% from the third quarter of 2006. Diluted earnings per share were $0.09 in the third quarter of 2007 as compared to $0.10 in the third quarter of 2006.

For the first nine months of 2007, total revenues were $456.8 million, an increase of 12.5% over the first nine months of 2006. Operating Income for the first nine months of 2007 was $63.7 million, an increase of 1.1% from the same period in 2006. Net income in the first nine months of 2007 was $23.4 million, up 11.2% from the first nine months of 2006. Diluted earnings per share were $0.29 in the first nine months of 2007 as compared to $0.26 in the same period of 2006.

Third Quarter Results of Operations

- 33 -

Total revenues in the third quarter of 2007 were $156.6 million, an increase of 9.6% from revenues of $142.9 million in the third quarter of 2006. Same store revenues for cash advance and ATM surcharge increased 8.7% in the third quarter of 2007.

The following is a comparison of selected revenue components for the third quarter of 2007 to the same period in 2006:

- Cash advance revenues were up 9.2%, from $75.9 million to $82.9 million. Cash disbursed increased 11.5%, from $1.51 billion to $1.68 billion. The number of transactions increased 8.3%, from 2.7 million to 3.0 million. The average transaction amount increased from $551.18 to $567.08. The average fee decreased from 5.03% to 4.93%. Average revenue per transaction increased 0.8% from $27.72 to $27.94.

- ATM revenues increased 8.2% to $62.2 million. The number of transactions increased 5.2%, from 17.9 million to 18.9 million. Cash disbursed was $3.5 billion compared to $3.2 billion, an increase of 9.1%. Average revenue per transaction increased 2.8% from $3.21 to $3.30.

- Check services revenues were $8.2 million, an increase of 14.3%. The face amount of checks warranted increased by 5.6%, from 340.6 million to 359.7 million. The number of check warranty transactions grew 6.6%, from 1.29 million to 1.37 million. The average face amount per check warranted decreased from $264.18 to $261.80. The average check warranty fee increased from 1.91% to 2.03%. Average check warranty revenue per transaction increased from $5.05 to $5.31.

- Central Credit and other revenues increased 42.6%, from $2.3 million to $3.3 million. Most of the increase is attributable to the interest and fee revenue from the Arriva Card in Q3 2007 of $0.8 million vs. $0.1 million in the comparable 2006 quarter.

Cost of revenues (exclusive of depreciation and amortization) increased 9.4% in the third quarter of 2007 to $112.5 million from $102.8 million in the third quarter of 2006. Commissions, the largest component of cost of revenues, increased 9.5%. Interchange increased 8.8%, driven largely by the increase in cash advance volumes.

Operating expenses in the third quarter of 2007 were $21.2 million, an increase of 38.0% over the same period in 2006. Operating expenses, excluding non-cash compensation expense and items that do not occur on a recurring basis, were $15.0 million in the current quarter, an increase of 14.8% from the comparable total of $13.0 million in the third quarter of 2006. This increase is principally due to additional payroll, related benefit costs and higher professional service expenses.

Depreciation and amortization expense was $3.0 million in the third quarter of 2007, an increase of 21.5% from $2.5 million in the third quarter of 2006.

Interest income was $1.0 million in the third quarter of 2007, a decrease of 12.6% from the comparable 2006 period.

Interest expense in the third quarter of 2007 was $9.5 million as compared to $10.9 million in the third quarter of 2006. Interest expense on the Company's borrowings declined $1.3 million due to the lower level of outstanding indebtedness and lower interest rates on the floating rate portion of that indebtedness in the third quarter of 2007. Interest expense on the Company's ATM funds decreased $0.1 million from $4.1 million in Q3 2006 to $4.0 million in Q3 2007, primarily as a result of increases in the LIBOR on which those funds are priced and offset by a reduction in the average ATM funds outstanding from $286.5 million in Q3 2006 to $276.9 million in Q3 2007.

Income tax expense in the third quarter of 2007 was $4.4 million. The Company's provision in the third quarter of 2007 is based on an expected full year effective rate of 38.4%.

\* \* \*

Financial Guidance

The company is reiterating its revised 2007 EPS guidance from the second quarter. Revenues for the month of October have been softer than expected, but were consistent with weakness experienced in many of the major gaming markets. Our revenues will also be impacted by the previously announced cessation of business in the UK. To help offset the negative impact to earnings from the reduced revenue, the company has implemented certain cost reduction measures in the fourth quarter.

For the fourth quarter of fiscal 2007, the Company currently expects revenues in a range of $152 million to $157 million and Adjusted Cash EPS of approximately $0.18 per diluted share.

In the fourth quarter, we currently expect to record approximately $8.2 million in non-cash compensation expense related to the accelerated vesting of various equity awards for our former Chief Executive Officer. Additionally, we expect approximately $0.8 million in cash-based compensation expense that will be made to the former Chief Executive Officer and cash-based severance expense made to certain former members of our management team whose employment was terminated in October 2007. It is expected that a significant portion of the awards to our former Chief Executive Officer will not be deductible for U.S. Federal Income Tax purposes, which could have an adverse impact on our expected tax provision for the fourth quarter and the fiscal year. Our expectation for the results for the fourth quarter will exclude any impact from these non-recurring termination benefits.

### THE TRUTH IS FINALLY REVEALED

64.     On November 14, 2007, the Individual Defendants announced that GCA was delaying the filing of its third quarter 2007 financial report on Form 10-Q pending a purported internal investigation of allegations made by an undisclosed whistle-blower. The Individual Defendants did not disclose any further details concerning the individual or the identity of the whistle-blower on this date.

65.     On December 7, 2007, the Individual Defendants hosted an investor conference call to discuss the Company's ongoing internal investigation. During the call, defendant Betts disclosed that one of the whistle-blower's allegations was that the Company had "mis-classified" transactions for the purpose of avoiding payment of certain transaction fees. Betts further disclosed that GCA's internal investigation, in response to this allegation, discovered that commissions payable to twenty of GCA's customers were mis-calculated and that transactions with respect to 120 other customers were improperly reported.

66.     The Individual Defendants currently estimate that the Company will need to expend approximately *$10 million* to resolve the commission issues and correct GCA's defective internal controls.

67.     The purported internal investigation was led by the Audit Committee—*the very same defendants who failed to ensure the correction of GCA's internal controls pertaining to the payment of commissions*. Unsurprisingly, on January 30, 2008, the GCA disclosed in a Form 10-Q that the Audit Committee had already completed its investigation and "uncovered no evidence of fraud or intentional misconduct."

68.     Nevertheless, GCA was forced to record *$2.6 million* in additional commission expense to cover "potential disputes" with customers unsatisfied with the Audit Committee's so-called investigation. Further, Individual Defendants disclosed that "[i]t is reasonably possible that we will be required to pay additional amounts to settle commission disputes related to our reporting of commissionable transactions." The Audit Committee's investigation cost GCA *$4.3 million*.

## REASONS THE STATEMENTS WERE IMPROPER

69.    The Individual Defendants' Relevant Period statements failed to disclose and misrepresented the following material, adverse facts, which they knew, consciously disregarded, were reckless and grossly negligent in not knowing or should have known:

(a)    GCA's cost of revenues, and in particular its commissions, were understated;

(b)    GCA's internal controls continued to be defective throughout 2007; and

(c)    as a result of the foregoing, GCA's reported earnings for the first three quarters of fiscal 2007 were inaccurate.

## THE INDIVIDUAL DEFENDANTS CAUSE GCA TO ENGAGE IN A STOCK BUYBACK

70.    On or about February 6, 2007, **when the Board was aware of GCA's defective internal controls**, the Board authorized the repurchase of up to **$50 million** of the Company's shares with Company money.

71.    Subsequently, under the Board's authorization, while GCA's stock was artificially inflated due to the Individual Defendants' improper statements described above, the Company bought back over **$27.8 million** worth of the Company's own shares at an average price of approximately $12.58 per share, which is more than double GCA's current share price of approximately $6 per share and comparable to the $14.32 per share the Insider Selling Defendants averaged in selling their own GCA stock holdings during the Relevant Period.

72.    On information and belief, in authorizing the buyback, the Board members failed to properly discuss and consider GCA's defective internal controls and its effect on the Company's reported financial results . Meanwhile, as GCA was repurchasing these shares, the Insider Selling Defendants made the illicit insider sales described herein.

## ILLICIT INSIDER SELLING

73.    The Insider Selling Defendants, because of their positions, knew that the statements the Company publicly made were materially false and misleading.  They also knew that the misstatements would create an inflated stock price for GCA stock.  The Insider Selling Defendants took advantage of this undisclosed information to sell their personally held stock.  While in

possession of undisclosed material adverse information, the Insider Selling Defendants sold the following shares of GCA stock:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| FITZGERALD | 2/21/2007 | 129,300 | $16.10 | $2,081,342.10 |
| | 2/22/2007 | 400 | $16.10 | $6,440.00 |
| | | **129,700** | | **$2,087,782.10** |
| | | | | |
| HAGERTY | 2/7/2007 | 7,533 | $16.40 | $123,541.20 |
| | 3/7/2007 | 597 | $14.98 | $8,943.06 |
| | 4/9/2007 | 586 | $16.12 | $9,446.32 |
| | 5/7/2007 | 597 | $15.99 | $9,546.03 |
| | 6/7/2007 | 597 | $16.26 | $9,707.22 |
| | 7/9/2007 | 591 | $16.32 | $9,645.12 |
| | 7/27/2007 | 59,052 | $14.22 | $839,719.44 |
| | | **69,553** | | **$1,010,548.39** |
| | | | | |
| KORTSCHAK | 2/21/2007 | 129,300 | $16.10 | $2,081,342.10 |
| | 2/22/2007 | 400 | $16.10 | $6,440.00 |
| | | **129,700** | | **$2,087,782.10** |
| | | | | |
| SANFORD | 2/7/2007 | 14,696 | $16.40 | $241,014.40 |
| | 3/7/2007 | 1,568 | $14.98 | $23,488.64 |
| | 4/9/2007 | 1,346 | $16.12 | $21,697.52 |
| | 5/7/2007 | 3,144 | $15.99 | $50,272.56 |
| | 6/7/2007 | 1,646 | $16.26 | $26,763.96 |
| | 7/9/2007 | 1,629 | $16.32 | $26,585.28 |
| | 8/7/2007 | 1,646 | $14.55 | $23,949.30 |
| | 5/7/2007 | 1,370 | $15.99 | $21,906.30 |
| | 9/7/2007 | 1,646 | $11.04 | $18,171.84 |
| | 10/8/2007 | 1,646 | $11.14 | $18,336.44 |
| | 11/1/2007 | 118,969 | $10.00 | $1,189,690.00 |
| | | **149,306** | | **$1,661,876.24** |
| | | | | |
| TOTAL | | **478,259** | | **$6,847,988.83** |

74.     The Insider Selling Defendants' stock sales began in February 2007, in conjunction with the Board's authorization of the repurchase of up to $50 million of GCA's shares. These sales also coincided with the Individual Defendants' February 8, 2007 announcement of favorable GCA earnings fueled by what turned out to be underpaid commissions.

75.     Further, the Insider Selling Defendant's stock sales also occurred *before* the Individual Defendants' first disclosure of the Company's materially deficient internal controls which commenced with the publication of the Company's 2006 Annual Report on SEC Form 10-K on

March 30, 2007. In other words, the stock sales challenged herein began at a time when the Individual Defendants were finalizing GCA's 2006 Annual Report, which they knew was going to disclose a materially deficient internal control environment, but before this material disclosure was actually issued.

## DAMAGES TO GCA CAUSED BY THE INDIVIDUAL DEFENDANTS

76.     As a result of the Individual Defendants' improprieties, GCA disseminated improper statements concerning its business prospects as alleged above. These improper statements have devastated GCA's credibility as reflected by the Company's *$913 million* market capitalization loss.

77.     Further, as a direct and proximate result of the Individual Defendants' action, GCA has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)     Costs incurred in connection with the investigation of the whistle-blower's allegations;

(b)     costs incurred in connection with resolving underpaid commissions and other fees;

(c)     costs incurred with the Audit Committee's investigation;

(d)     costs incurred from the $27.8 million that GCA spent repurchasing its own inflated stock; and

(e)     costs incurred in correcting GCA's defective internal controls.

78.     Moreover, these actions have irreparably damaged GCA's corporate image and goodwill. For at least the foreseeable future, GCA will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that GCA's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

79.     Plaintiffs bring this action derivatively in the right and for the benefit of GCA to redress injuries suffered, and to be suffered, by GCA as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the

Individual Defendants. GCA is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

80.     Plaintiffs incorporate by reference all preceding and subsequent paragraphs as set forth herein.

81.     Plaintiffs will adequately and fairly represent the interests of GCA in enforcing and prosecuting its rights.

82.     Plaintiffs are and were owners of the stock of GCA during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remain shareholders of the Company.

83.     The Board of GCA at the time of the initiation of this action consisted of the following eight directors: defendants Betts, Fitzgerald, Kortschak, Cucinotta, Judge, Kilburn, Maskatiya and Enlow.

84.     Defendants Betts, Fitzgerald, Kortschak, Cucinotta, Judge, Kilburn, Maskatiya and Enlow, as directors on the Board during the Relevant Period, failed to take action to direct GCA to timely and sufficiently correct its defective internal controls despite the fact that they have known about these deficiencies since at least December 31, 2006 (if not sooner). These defective internal controls caused GCA to underpay its commissions and other fees and improperly report its financial results. These defendants' failure to effectively act amounts to bad faith because it was a conscious and intentional disregard of their fiduciary duties. Further, their failure to act in the face of the known defective internal controls was not the product of valid business judgment. Accordingly, demand would have been futile as to defendants Betts, Fitzgerald, Kortschak, Cucinotta, Judge, Kilburn, Maskatiya and Enlow.

85.     As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the defendants knew the adverse, non-public information regarding GCA's true business prospects. While in possession of this material, adverse, non-public information regarding the Company, the following current members of the GCA Board participated in the illegal insider selling by selling the following amounts:

(a)    while in possession of adverse non-public information, Fitzgerald sold 129,700 shares of GCA stock for proceeds of $2,087,782.10; and

(b)    while in possession of adverse non-public information, Kortschak sold 129,700 shares of GCA stock for proceeds of $2,087,782.10.

Because these defendants received personal financial benefits from challenged insider trading transactions, these defendants are directly interested in a demand. Moreover, these defendants face a sufficiently substantial threat of liability for breach of their fiduciary duties for insider selling. Thus, demand would have been futile with respect to Fitzgerald and Kortschak.

86.    Defendants Enlow, Harris, Judge and Kilburn were, during the Relevant Period, directors on the Audit Committee. Enlow, Harris, Judge and Kilburn are all interested in any demand because they face a substantial likelihood of liability as a result of their conduct on the Audit Committee during the Relevant Period. As set forth herein, the Audit Committee's charter provides that the Audit Committee is responsible for reviewing and discussing analyses of significant reporting issues; financial information and earnings guidance provided to analysts and rating agencies; and complaints from GCA employees in regards to accounting matters. Thus, the Audit Committee was responsible and involved in overseeing and directly participating in the dissemination of GCA's public statements and its internal control deficiencies. Despite these duties, the Audit Committee failed to adequately remedy the Company's defective internal controls, despite the fact that they were demonstrably aware of these issues as a result of the disclosures issued in the Company's Annual Report for 2006, published on March 30, 2007. Enlow, Harris, Judge and Kilburn all consciously ignored red-flags with respect to the Company's deficient internal controls, and those decisions caused the Company to suffer damages. Thus, demand would have been futile as to Enlow, Harris, Judge and Kilburn.

87.    The principal professional occupation of Betts is his employment with GCA, pursuant to which he received and continues to receive substantial monetary compensation and other benefits. Accordingly, Betts lacks independence from defendants Fitzgerald, Kilburn and Kortschak, defendants who are not disinterested and/or independent and who exert influence over Betts's compensation by virtue of their positions as members of the Compensation Committee. The

Compensation Committee has the authority to review and approve Betts's base salary, bonus and equity compensation. This lack of independence rendered defendant Betts incapable of impartially considering a demand to commence and vigorously prosecute this action. Thus, demand is futile as to Betts.

88.     Defendants Maskatiya and Cucinotta have substantial business relationships that render them incapable of independently considering demand with respect to other interested directors. In particular, Maskatiya and Cucinotta together hold a 100% ownership interest in M&C International. Moreover, GCA has multiple agreements with M&C International and other entities controlled by Maskatiya and Cucinotta. For example, GCA provides gaming patron credit bureau services to M&C International subsidiary Casino Credit Services. Maskatiya also controls a company called Infonox on the Web, which develops, maintains, hosts, operates, monitors and supports software for GCA. During fiscal 2007, GCA paid Infonox on the Web approximately $3.6 million in connection with these services. Maskatiya and Cucinotta also own two companies called USA Payments and USA Payment Systems, which provide electronic payment processing services for the Company. During fiscal year 2007, GCA paid USA Payments and USA Payment Systems approximately $4.4 million in connection with these services. Due to the lucrative business relationships between entities controlled by Maskatiya and Cucinotta and GCA, these defendants were incapable of independently considering a demand. Therefore, demand was futile as to defendants Maskatiya and Cucinotta.

## COUNT I

**Against All Defendants for Breach of Fiduciary Duty for Improper Financial Reporting**

89.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

90.     The Individual Defendants owed and owe GCA fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe GCA the highest obligation of good faith, fair dealing, loyalty and due care.

91.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

92.     Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results and business prospects of the Company.  In particular, the Individual Defendants' Relevant Period statements improperly portrayed the Company's internal controls and underpayment of commissions and other fees.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's legitimate corporate interests.

93.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, GCA has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

94.     Plaintiffs, on behalf of GCA, have no adequate remedy at law.

### COUNT II

**Against All Defendants for Breach of Fiduciary Duty for Abuse of Control**

95.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

96.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence GCA, for which they are legally responsible.  In particular, the Individual Defendants abused their positions of authority by causing or allowing GCA to issue statements that improperly portrayed the Company's financial results and business prospects.

97.     As a direct and proximate result of the Individual Defendants' abuse of control, GCA has sustained significant damages.  These damages include, but are not limited to, GCA's severe loss of market credibility as reflected in its $913 million market capitalization loss, costs incurred in connection with the investigation of the whistle-blower's allegations, $27.8 spent to re-purchase its own shares and substantial costs in connection with correcting its internal controls.

98.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

99.     Plaintiffs, on behalf of GCA, have no adequate remedy at law.

## COUNT III

### Against All Defendants for Breach of Fiduciary Duty for Gross Mismanagement

100.    Plaintiffs incorporates by reference and reallege each and every allegation contained above, as though fully set forth herein.

101.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of GCA in a manner consistent with the operations of a publicly held corporation.

102.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, GCA has sustained significant damages in excess of millions of dollars.

103.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

104.    Plaintiffs, on behalf of GCA, have no adequate remedy at law.

## COUNT IV

### Against All Defendants for Waste of Corporate Assets

105.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

106.    As a result of the misconduct described above, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, paying bonuses to certain of its executive officers and incurring potentially hundreds of millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions, costs incurred in connection with the investigation of the whistle-blower's allegations and paying $27.8 million to repurchase its own shares at artificially inflated prices.

107.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

108.    Plaintiffs, on behalf of GCA, have no adequate remedy at law.

## COUNT V

### Against All Defendants for Unjust Enrichment

109.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

110.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of GCA.

111.   Plaintiffs, as shareholders and representatives of GCA, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment as follows:

A.   Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets and unjust enrichment;

B.   Directing GCA to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect GCA and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.   a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.   a provision to permit the shareholders of GCA to nominate at least three candidates for election to the Board;

3.   a proposal to reform GCA's defective internal controls over financial reporting;

4.   a proposal to control insider selling;

- 45 -

5.      a proposal to ensure that GCA properly expends funds in stock repurchase programs;

6.      a proposal to ensure the accuracy of the qualifications of GCA's directors, executives and other employees; and

7.      a proposal to appropriately test and then strengthen the internal audit functions.

D.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting defendants' assets so as to assure that plaintiff on behalf of GCA has an effective remedy;

E.      Awarding to GCA restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

F.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: May 5, 2008

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
JEFFREY P. FINK
ARSHAN AMIRI


_____/s/ Jeffrey P. Fink_____
JEFFREY P. FINK

610 W. Ash Street, Suite 1800
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile:  (619) 525-3991

THE WEISER LAW FIRM, P.C.
ROBERT B. WEISER
BRETT D. STECKER
121 N. Wayne Avenue, Suite 100

Wayne, PA 19087
Telephone: (610) 225-2677
Facsimile:  (610) 225-2678

Co-Lead Counsel for Plaintiffs

BLACK & LOBELLO
JOHN P. ALDRICH
10777 West Twain Avenue, Suite 300
Las Vegas, NV 89135
Telephone: (702) 869-8801
Facsimile:  (702) 869-2669

Liaison Counsel for Plaintiffs

BARRETT JOHNSTON & PARSLEY
TIMOTHY L. MILES
217 Second Avenue North
Nashville, TN 37201-1697
Telephone: (615) 244-2202
Facsimile:  (615) 252-3798

Counsel for Plaintiff David Stueve

ALBRIGHT STODDARD
   WARNICK & ALBRIGHT
G. MARK ALBRIGHT
MARTIN A. MUCKLEROY
Quail Park I, Building D-4
801 S. Rancho Drive
Las Vegas, NV 89106
Telephone: (866) 249-1942
Facsimile:  (702) 384-0605

Counsel for Plaintiff Vicki Mollenkopf

339238_11.DOC

## ATTORNEY VERIFICATION

I, Robert B. Weiser, Esquire, hereby verify that I am the attorney for Plaintiff Vicki E. Mollenkopf. I further verify that Vicki E. Mollenkopf is familiar with the allegations in the foregoing Verified Consolidated Derivative Complaint; that Vicki E. Mollenkopf has authorized the filing of the Verified Consolidated Derivative Complaint; and that the allegations set forth in the Verified Consolidated Derivative Complaint are true and correct to the best of Vicki E. Mollenkopf's knowledge, information, and belief.

Dated: May 5, 2008

ROBERT B. WEISER

## CERTIFICATE OF SERVICE

I hereby certify a true and exact copy of the foregoing documents has been served on all filing users indicated on the attached Electronic Mail Notice List through the Court's electronic filing system on this the 5th day of May, 2008.


/s/ Jeffrey P. Fink

# Mailing Information for a Case 2:07-cv-01659-JCM-PAL

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **John P. Aldrich**
  jaldrich@blacklobellolaw.com,sroy@blacklobellolaw.com,tbixenmann@blacklobellolaw.com

- **Jeffrey P. Fink**
  jfink@ruflaw.com

- **Timothy L. Miles**
  tmiles@barrettjohnston.com

- **Erik J. Olson**
  EJOlson@mofo.com

- **James J. Pisanelli**
  lit@bhfs.com

- **Darryl P. Rains**
  DRains@mofo.com

- **Brian J. Robbins**
  notice@ruflaw.com

- **Olga A. Tkachenko**
  otkachenko@mofo.com,vvandergrift@mofo.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)