Stuart M. Grant (Bar No. SG-8157)
Megan D. McIntyre
Jeff A. Almeida
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue, 29th Floor
New York, NY  10017
Telephone:    (646) 722-8500
Facsimile:    (646) 722-8501
*Attorneys for Lead Plaintiff and Lead Counsel for the Class*



# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE GLOBAL CASH ACCESS HOLDINGS, INC. SECURITIES LITIGATION | Master File No. 08 Cv. 3516 (SWK) |
|  | **JURY TRIAL DEMANDED** |

# CONSOLIDATED CLASS ACTION COMPLAINT

Stuart M. Grant (Bar No. SG-8157)
Megan D. McIntyre
Jeff A. Almeida
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue, 29th Floor
New York, NY  10017
Telephone:    (646) 722-8500
Facsimile:    (646) 722-8501
*Attorneys for Lead Plaintiff and Lead Counsel for the Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

—————————————————————————
                                                    )
IN RE GLOBAL CASH ACCESS HOLDINGS,    )      Master File No. 08 Cv. 3516 (SWK)
INC. SECURITIES LITIGATION                      )
                                                    )      **JURY TRIAL DEMANDED**
—————————————————————————)


**CONSOLIDATED CLASS ACTION COMPLAINT**

## <u>TABLE OF CONTENTS</u>

Page

I.  SUMMARY OF THE ACTION ................................................................................1

II.  JURISDICTION AND VENUE ............................................................................6

III.  PARTIES ................................................................................................................7

    A.  Plaintiff ........................................................................................................7

    B.  GCAH .........................................................................................................7

    C.  The Insider Defendants ...............................................................................9

    D.  The Director Defendants ............................................................................12

    E.  The Insider Selling Entities .......................................................................12

    F.  The Underwriter Defendants ......................................................................13

    G.  Deloitte & Touche LLP .............................................................................17

IV.  CLASS ACTION ALLEGATIONS ....................................................................17

V.  SUBSTANTIVE ALLEGATIONS .....................................................................19

    A.  The Company's Business ...........................................................................19

    B.  The Company Under-Prices The Competition To Win Business ..........................22

    C.  GCAH Conducts an IPO ...........................................................................23

    D.  GCAH Completes Its Secondary Offering ...............................................28

    E.  After The IPO And Secondary Offering Are Completed, The Company Discloses Significant Deficiencies In Its Internal Controls And Existing Litigation Over Customer Commission Payments ................................................32

VI.  THE TRUTH ABOUT THE COMPANY'S MISCALCULATION AND MISREPORTING OF COMMISSION PAYMENTS BEGINS TO EMERGE ............................................................................................................35

VII.  THE REGISTRATION STATEMENTS AND PROSPECTUSES CONTAINED UNTRUE STATEMENTS AND OMITTED FACTS THAT WERE MATERIAL TO INVESTORS ................................................40

VIII.   DEFENDANTS' NEGLIGENCE WITH REGARD TO THE OFFERING
        MATERIALS FOR THE IPO AND SECONDARY OFFERING ....................................43

        A.      The Company, the Insider Defendants, the Director Defendants and the
                Insider Selling Entities ...........................................................................................43

        B.      Deloitte ...................................................................................................................45

        C.      The Underwriter Defendants ...................................................................................48

IX.     NO SAFE HARBOR .........................................................................................................49

X.      COUNTS ...........................................................................................................................49

XI.     PRAYER FOR RELIEF ....................................................................................................59

XII.    JURY DEMAND ...............................................................................................................60

Lead Plaintiff City of Richmond Retirement System ("Richmond" or "Plaintiff"), individually and on behalf of all other persons and entities who purchased or otherwise acquired shares of Global Cash Access Holdings, Inc. ("GCAH") common stock from September 22, 2005 to November 14, 2007, inclusive (the "Class Period"), by its undersigned attorneys, alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters.

Plaintiff's information and belief is based on its investigation (made by and through its attorneys), which included, *inter alia*, a review and analysis of: (1) public documents pertaining to GCAH and its predecessors, subsidiaries, and affiliates, including Global Cash Access, Inc. ("GCA") (collectively referred to herein as the "Company") and the Defendants (defined *infra*); (2) the Company's filings with the Securities and Exchange Commission ("SEC"); (3) press releases, earnings releases, and other public statements by the Company or the Defendants; (4) analyst reports and conference call transcripts concerning the Company; and (5) media coverage in the financial press regarding the Company, its business or the Defendants.

Many of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their custody and/or control. Plaintiff believes that further substantial evidentiary support will exist for the allegations in this Consolidated Complaint after a reasonable opportunity for discovery.

## I.    <u>SUMMARY OF THE ACTION</u>

1.    This is a federal securities class action brought pursuant to the Securities Act of 1933 ("Securities Act") on behalf of all persons (other than Defendants and certain other excluded persons described *infra*) who purchased or otherwise acquired GCAH's publicly-traded common stock during the Class Period, including (a) those who purchased in the initial public offering ("IPO") of GCAH stock which took place pursuant to a prospectus (the "Prospectus")

filed on September 23, 2005 as part of Form S-1 and S-1/A registration statements filed between March 22, 2005 and September 22, 2005 (collectively, the "Registration Statement"), (b) those who purchased in the secondary offering of GCAH stock (the "Secondary Offering") which took place pursuant to a prospectus (the "Second Prospectus") filed on May 25, 2006 as part of Form S-1 and S-1/A registration statements filed between May 11, 2006 and May 24, 2006 (collectively, the "Second Registration Statement"), and (c) those who otherwise purchased or acquired shares of GCAH stock that are traceable to the Registration Statement or Secondary Registration Statement.  As alleged herein, the Prospectus, Registration Statement, Second Prospectus, and Second Registration Statement contained untrue statements and omissions of material fact that served to artificially inflate the price of GCAH stock, causing Plaintiff and the Class members who purchased the stock at those prices to suffer significant damages when a series of corrective disclosures by the Company caused the truth to be partially revealed.

2.      This action is brought against the individuals and entities who are responsible for the untrue statements and omissions of material fact in the Prospectus, Registration Statement, Second Prospectus, and Second Registration Statement:  GCAH, Kirk Sanford, Harry C. Hagerty, III, Karim Maskatiya, Robert Cucinotta, Walter G. Kortschak, Charles J. Fitzgerald, E. Miles Kilburn, William H. Harris, M&C International, Summit Partners, L.P., Goldman Sachs & Co., J.P. Morgan Securities, Inc., JPMorgan Chase & Co. (as successor-in-interest to Bear, Stearns & Co. Inc.), Cowen & Co., LLC, Deutsche Bank Securities, Inc., Banc of America Securities LLC, Citigroup Global Markets LLC, Wachovia Capital Markets, LLC, and Deloitte & Touche LLP (collectively, "Defendants").  The claims set forth herein are strict liability and negligence-based claims, and Plaintiff specifically disclaims any allegations of fraud.

3.    Headquartered in Las Vegas, Nevada, GCAH, through its wholly-owned operating subsidiary, GCA, provides cash access and customer relationship marketing technologies to the gaming industry.  The Company's products and services allow patrons at gaming establishments (*e.g.*, casinos), throughout the United States and internationally, to access cash through a variety of methods including ATM cash withdrawals, credit card cash advances, point-of-sale debit card transactions, check verification and warranty, and money transfers.

4.    On September 22, 2005, GCAH went public, initially offering 16,064,157 shares of its common stock at a price of $14.00 per share.  Of these shares, 9 million were offered and sold on behalf of the Company while 7,064,157 were offered and sold by insider selling stockholders looking to cash out.  In October 2005, an additional 2,212,224 shares of common stock covered by an over-allotment option granted to the underwriters were also sold as part of the IPO, with 1,053,568 of those shares being offered by GCAH, and the remaining 1,165,656 shares being offered by insider selling stockholders.  Based upon the information that was disseminated in the Prospectus and Registration Statement – which was later revealed to be untrue and incomplete in material respects, as detailed further herein – GCAH enjoyed a successful, well-subscribed IPO, raising approximately $256 million in gross proceeds from members of the investing public, with the Company securing over $130 million for itself and insider selling stockholders receiving the remaining $126 million.

5.    Buttressed by the purportedly strong financial results disseminated by the Company and Defendants, GCAH's stock price soared to a Class Period high closing price of $19.49 on April 28, 2006, only seven months after the IPO.  The positive performance of GCAH's stock in after-market trading enabled a May 25, 2006 Secondary Offering of an additional 10.4 million shares of GCAH common stock at a price of $15.75 per share.  All of the

shares in the Secondary Offering were offered by insider selling stockholders (*i.e.*, the Company did not receive any proceeds from the shares sold in the Secondary Offering) with insiders receiving over $150 million in gross proceeds.

6.     The Company's reported successes were short-lived.  Beginning in July 2007, a group of high-ranking members of GCA's management team abruptly left the Company.  Harry C. Hagerty, III, the Company's Chief Financial Officer ("CFO") and an individual upon whom the Company was "highly dependent" according to the Prospectus, left in July 2007.  William H. Harris, a member of GCAH's Board of Directors (the "Board") and the Audit Committee of the Board, left in August 2007.  A few months later, in October 2007, GCAH announced that its President and Chief Executive Officer ("CEO"), Kirk Sanford – another individual upon whom the Prospectus had stated that the Company was "highly dependent" – would be leaving the Company to purportedly "pursue other interests and spend time with his family."  The exodus of these high-ranking executives (and others) and a member of the Board's Audit Committee raised serious red flags with analysts and investors, and GCAH's stock nose-dived from the $16 range in June and early July 2007 to around $10 per share by the end of October 2007.  But the worst was yet to come.

7.     On November 14, 2007, after the close of the markets and only two weeks after its President and CEO resigned, GCAH announced that it would delay the filing of its Quarterly Report on Form 10-Q for the period ending September 30, 2007, pending an internal investigation under the direction of an independent committee of the Board, with the assistance of independent counsel, into undisclosed allegations being raised by a whistleblower.  The market's reaction to this news was severe.  GCAH's stock price plummeted $5.49 per share from a closing price of $9.20 on November 14, 2007 to a closing price of $3.71 per share on

November 15, 2007 – a one day decline of 60% on extremely heavy trading volume of nearly 3.8 million shares (versus the average daily volume of less than 500,000 shares). In this one day, over $400 million of market capitalization was wiped out.

8.     In December 2007, the Company's new CEO, Scott Betts ("Betts"), announced that the investigation involved issues pertaining to the calculation of commissions payable to the Company's customers, which, according to the allegations of the whistleblower, the Company was "miscoding" for the purpose of avoiding payment of certain transaction fees to its customers. Betts disclosed that the internal review had uncovered miscalculation issues relating to approximately 20 of GCA's customers, and also issues with the reporting of transactions for these 20 customers and approximately 120 others. Betts also stated that there were other allegations still under investigation, but that the Company was continuing to keep them confidential pending completion of the investigation.

9.     On January 30, 2008, GCAH filed its delayed 10-Q, which revealed that the Company's financial statements in 2005 and 2006 had been misstated. The Company disclosed that, based upon the results of the internal investigation, it was "probable" that there would be disputes with customers regarding the amounts of the commissions paid, and that the Company would have to pay $2.6 million to settle those disputes. The Company recorded $2.6 million in additional commission costs (all of which were recorded as additional commission expense, which is a "cost of revenue" to the Company) for the quarter ending September 30, 2007. Of that amount, $1.9 million related to transactions completed in 2005 and 2006.

10.     By March 2008, the Company disclosed that the number of customers affected by the commission miscalculation problems had increased to 22, and that the probable financial

impact of the commission payment disputes had increased to at least $2.9 million, with a reasonable possibility that this number would increase even further.

11.     Because GCA competes in a highly competitive industry, where one cash access vendor could easily be replaced by another on any given casino floor, the impact of these revelations on the market's perception of GCA's business going forward was dramatic.  GCA not only faced the loss of current customers but the risk that new customers would hesitate to do business with it just long enough for a competitor to step in the door – risks whose potentially devastating impact the Company had acknowledged in the past, but which the Company had never before given investors any reason to believe were in imminent danger of materializing.

12.     GCAH's stock price has hardly recovered from the precipitous decline that followed the disclosure of these issues (currently trading at around $6 per share), as that disclosure fundamentally changed investors' and analysts' views of the Company's future prospects, and analysts and investors harbor concerns over these significant risks given the issues that continue to linger over the young Company.

## II.    <u>JURISDICTION AND VENUE</u>

13.     This action arises under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§77k, 77(a)(2) and 77o, respectively.

14.     This Court has subject-matter jurisdiction over this action pursuant to Section 22 of the Securities Act, 15 U.S.C. §77v(a), and pursuant to 28 U.S.C. § 1331.

15.     Venue is proper in this District pursuant to Section 22 of the Securities Act, 15 U.S.C. §77v(a), and 28 U.S.C. § 1391(b).  Many of the misrepresentations, acts and practices complained of herein occurred in substantial part in this District, including the closing of the IPO

and Secondary Offering, and several Defendants, including Deloitte & Touche LLP and the Underwriter Defendants (defined *infra*), maintain their primary places of business in this District.

16.     In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the New York Stock Exchange.

## III.  PARTIES

### A.     Plaintiff

17.     Plaintiff City of Richmond Retirement System, established in 1952, manages the pension assets for the public workers of the City of Richmond, Virginia.  Richmond manages assets totaling approximately $550 million for its more than 9800 members.  Richmond purchased a total of 34,255 shares of GCAH stock during the Class Period, including shares purchased in the IPO and in the Secondary Offering.[1]  All of the shares purchased by Richmond were registered pursuant to, and are traceable to, either the Registration Statement or the Second Registration Statement.  Richmond has been damaged as a result of the untrue statements and omissions in the Registration Statement, Prospectus, Second Registration Statement and Second Prospectus.  On June 26, 2008, the Court appointed Richmond as Lead Plaintiff for this consolidated litigation.

### B.     GCAH

18.     According to its website, the Company is the leading provider of cash access products and related services to the gaming industry in the United States, Canada and the Caribbean, with operations on over 1,000 gaming properties worldwide, and customers that

include nine of the ten largest gaming companies in the United States. Its products and services provide gaming establishment patrons access to cash through a variety of methods, including ATM cash withdrawals, point-of-sale debit card transactions, credit card cash advances, check verification and warranty services, and money transfers. In addition, the Company provides products and services that improve credit decision-making, automate cashier operations and enhance patron marketing activities for gaming establishments.

19.    The Company began operations in July 1998 as a joint venture limited liability company among Defendant M&C International ("M&C") and entities affiliated with non-parties Bank of America Corporation and First Data Corporation ("FDC"). In September 2000, Bank of America sold its entire ownership to M&C and FDC. In March 2004, the Company underwent a recapitalization whereby GCAH was formed to hold all of the outstanding capital stock of GCA. In connection with the recapitalization, GCA borrowed $495 million which was used, in part, to redeem all of FDC's ownership interest and a portion of M&C's interest, and Bank of America Corporation purchased a 4.99% ownership interest in GCAH from M&C. In May 2004, M&C sold a portion of its ownership interest in the Company to a number of private equity investors, including entities affiliated with Defendant Summit Partners, L.P. ("Summit"). Shortly thereafter, the Company converted from a limited liability company to a corporation.

20.    Defendant GCAH went public through an IPO in September 2005, and since that time its stock has been publicly traded on the New York Stock Exchange under the ticker symbol "GCA." GCAH is a holding company whose principal asset is 100% of the stock of its operating

---

[1] Attached as Exhibit 1 to this Consolidated Complaint is the Certification of City of Richmond Retirement System which, *inter alia,* attests to Richmond's purchases of GCAH's securities during the Class Period.

subsidiary, GCA.  GCA directly or indirectly owns all of the assets and either all or a majority of the equity interests in operating units of the business.  Both GCAH and GCA maintain their principal executive offices in Las Vegas, Nevada, and they share a common board of directors and set of executive officers.  At all relevant times, GCA's financial results were consolidated on GCAH's financial statements for financial reporting purposes.

### C.    <u>The Insider Defendants</u>

21.    Defendant Kirk Sanford ("Sanford") served as the President and Chief Executive Officer ("CEO") of GCAH and GCA from 1999 until his resignation on October 31, 2007. Sanford joined the Boards of both GCAH and GCA in March 2005 and remained on the Boards until his resignation as CEO in October 2007.  Sanford was a member of the Company's management committee when the Company conducted its operations as a limited liability company from 1998 through May 2004.  Before serving as the Company's CEO, Sanford was the Company's Executive Vice President of Sales, Marketing and Product Development from 1998 to 1999.  According to the Prospectus, the Company was "highly dependent on the involvement of" Sanford, who possessed "substantial experience with [the Company's] operations and the gaming patron cash access industry."  Prior to March 2005, Sanford owned 1% of M&C and provided advisory services to M&C, for which he was paid approximately $17.3 million in 2004, $1 million in 2003, and $600,000 in 2002.  Additionally, in March 2005, M&C transferred 575,213 shares of Company stock to Sanford, issued a note in the amount of $7,572,696.21 that was payable to Sanford upon consummation of the IPO, and forgave a note from Sanford in the principal amount of $5,741,178, all in further consideration of his advisory services to M&C.  At or about the same time, M&C redeemed Sanford's ownership interest in M&C for 283,239 shares of the Company's stock and $437,717.82 in cash.  Sanford signed the Registration Statement and the Second Registration Statement.    Sanford offered and sold

300,000 shares of GCAH common stock in the Secondary Offering, for total proceeds of over $4,500,000.

22.     Defendant Harry C. Hagerty, III ("Hagerty") served as the Company's Executive Vice President and Chief Financial Officer ("CFO") from July 2004 to July 27, 2007, when his employment terminated for undisclosed reasons.  According to the Prospectus, the Company was "highly dependent on the involvement of" Hagerty, who possessed "substantial experience with [the Company's] operations and the gaming patron cash access industry."  Hagerty signed the Registration Statement and the Second Registration Statement.  Hagerty offered and sold 100,000 shares of his personal GCAH common stockholdings in the Secondary Offering.

23.     Defendant Karim Maskatiya ("Maskatiya") was a co-founder of GCA and, at the time of the IPO and throughout the Class Period, was Co-Chairman of the Board of Directors of GCAH and GCA.  Maskatiya either personally or through an attorney-in-fact signed the Registration Statement and Second Registration Statement.  Maskatiya beneficially owned 50% of Defendant M&C International ("M&C") and during the Class Period served as M&C's President and Chairman.  M&C offered and sold 2,774,870 shares of GCAH common stock in the IPO, and an additional 4,215,810 shares of GCAH common stock in the Secondary Offering, for total proceeds of over $99,000,000.  Maskatiya maintains his principal place of business at M&C's offices located at 643 River Oaks Parkway, San Jose, California 95134.

24.     Defendant Robert Cucinotta ("Cucinotta") was a co-founder of GCA and, at the time of the IPO and throughout the Class Period, was a Director of GCAH and GCA.  Cucinotta, either personally or through an attorney-in-fact, signed the Registration Statement and Second Registration Statement.  Cucinotta beneficially owned 50% of M&C and during the Class Period

served as M&C's Secretary.  Cucinotta maintains his principal place of business at M&C's offices located at 643 River Oaks Parkway, San Jose, California, 95134.

25.    Defendant Walter G. Kortschak ("Kortschak") served as Co-Chairman and member of the Board of Directors of GCAH and GCA throughout the Class Period.  Kortschak is a managing partner of Summit Partners, L.P. ("Summit"), a private equity and venture capital firm that invested in GCA ahead of the IPO, and a managing member of various entities affiliated with Summit.  Kortschak was a designee to the Board pursuant to a stockholders agreement that was entered into among GCA stockholders prior to the Company's IPO. Kortschak also served as a member of the Audit Committee of the Board prior to the IPO and through September 2006.  Pursuant to its charter, the Audit Committee's responsibilities included, *inter alia*: overseeing the integrity of the Company's financial statements and the performance of the Company's internal audit function and independent auditors; discussing the Company's major financial risk exposures and steps management has taken to monitor and control such exposures; and evaluating the adequacy and effectiveness of the Company's internal controls and disclosure controls.  Kortschak signed the Registration Statement and Second Registration Statement either personally or through an attorney-in-fact.

26.    Defendant Charles J. Fitzgerald ("Fitzgerald") served as a member of the Board of Directors of GCAH and GCA throughout the Class Period.  Fitzgerald is a partner of Summit and member of various entities affiliated with Summit.  Like Defendant Kortschak, Fitzgerald was Summit's designee to the Board.  Fitzgerald was a member of the Audit Committee of the Board prior to the IPO, and was replaced by Defendant William H. Harris on the Audit Committee upon the consummation of the IPO.  Fitzgerald signed the Registration Statement and Second Registration Statement either personally or through his attorney-in-fact.

27.     Defendants Sanford, Hagerty, Maskatiya, Cucinotta, Kortschak and Fitzgerald are sometimes collectively referred to herein as the "Insider Defendants."

### D.     The Director Defendants

28.     Defendant E. Miles Kilburn ("Kilburn") joined the Company's Board of Directors in March 2005 and became Chairman of the Audit Committee of the Board upon the consummation of the IPO.  He served in those positions through the end of the Class Period. From 2003 to 2004, Kilburn was Executive Vice President and Chief Strategy Officer with Concord EFS, Inc., which became a wholly-owned subsidiary of FDC in February 2004. Kilburn, either personally or through an attorney-in-fact, signed the Registration Statement and Second Registration Statement.

29.     Defendant William H. Harris ("Harris") joined the Board of Directors in April 2005 and became a member of the Audit Committee of the Board upon the consummation of the IPO.  He served in those positions until August 31, 2007, when he resigned.  Harris was the CEO of PayPal, Inc. from October 1999 to May 2000, and has since been a private investor and chairman of numerous privately held companies.  Harris, either personally or through an attorney-in-fact, signed the Registration Statement and Second Registration Statement.

30.     Defendants Kilburn and Harris are sometimes collectively referred to herein as the "Director Defendants."

### E.     The Insider Selling Entities

31.     Defendant M&C International ("M&C") is a provider of authorizations for credit card cash advances, point-of-sale debit car transactions and ATM withdrawal transactions, located in San Jose, California.  Defendants Maskatiya and Cucinotta comprised the board of directors of M&C and each beneficially owns 50% of M&C.  Prior to the time of the IPO, M&C beneficially owned 27,748,698 shares of GCAH Common Stock constituting 38.69% of GCAH's

outstanding Common Stock, of which it offered and sold 2,774,870 shares in the IPO for total net proceeds of more than $36 million.  Subsequent to the IPO, M&C still owned 30.94% of GCAH common stock which was subject to a 180-day post-IPO lock-up period.  After the end of the 180-day lock-up period, M&C, along with Summit (and others), initiated a Secondary Offering in which it sold an additional 4,215,810 shares of GCAH stock for proceeds of over $63,000,000.   After the Secondary Offering, M&C continued to own 24.7% of GCAH's outstanding shares.

32.     Defendant Summit Partners, L.P. ("Summit") is a private equity and venture capital firm located at 499 Hamilton Avenue, Suite 200, Palo Alto, California 94301.  In May 2004, M&C sold a portion of its ownership interest in GCAH to a number of private equity investors, including entities affiliated with and/or managed by Summit.  Defendants Kortschak and Fitzgerald are partners and members of various entities affiliated with Summit.  Prior to GCAH's IPO, Summit beneficially owned 25,040,808 shares of GCAH common stock constituting 34.91% of GCAH's outstanding common stock, of which it offered and sold 2,504,081 shares in the IPO for total net proceeds of more than $35 million.  Subsequent to the IPO, Summit still beneficially owned 27.92% of GCAH common stock which was subject to a 180-day IPO lock-up period.  After the end of the 180-day lock-up period, Summit, along with M&C (and others), initiated a Secondary Offering in which it offered and sold an additional 4,215,810 shares of GCAH stock for proceeds of over $66,000,000.   After the Secondary Offering, Summit continued to beneficially own 21.8% of GCAH's outstanding shares.

**F.     The Underwriter Defendants**

33.     Defendant Goldman Sachs & Co., Inc. ("Goldman Sachs"), a subsidiary of The Goldman Sachs Group, is an investment banking firm that provides securities underwriting, financial advisory, capital raising, and sales and trading services.  Goldman Sachs maintains its

principal executive offices at 85 Broad Street, New York, New York 10004.  Goldman Sachs acted as a co-lead underwriter with respect to the IPO and was directly responsible for the distribution and sale of at least 4,016,040 of the shares sold in the IPO with respect to which the $0.98 per share underwriting discount resulted in total fees of $3,935,719.20.

34.     Defendant J.P. Morgan Securities, Inc. ("JP Morgan"), the primary non-bank subsidiary of J.P. Morgan Chase, is an investment banking firm that provides securities underwriting, financial advisory, capital raising, and sales and trading services.  JP Morgan maintains its principal executive offices at 270 Park Avenue, New York, New York 10017.  JP Morgan acted as a co-lead underwriter with respect to the IPO and was directly responsible for the distribution and sale of at least 4,016,040 of the shares sold in the IPO with respect to which the $0.98 per share underwriting discount resulted in total fees of $3,935,719.20.  JP Morgan also acted as lead underwriter in the Secondary Offering and was responsible for the distribution and sale of at least 5,200,001 of the shares sold in the Secondary Offering with respect to which the $0.75 per share underwriting discount resulted in total fees of $3,900,000.75.

35.     Defendant JPMorgan Chase & Co. is the successor-in-interest to Bear, Stearns & Co. Inc., which acted as an underwriter with respect to the IPO and was directly responsible for the distribution and sale of at least 1,606,416 of the shares sold in the IPO with respect to which the $0.98 per share underwriting discount resulted in total fees of $1,574,287.68.  In addition, Bear, Stearns & Co. Inc. acted as an underwriter in the Secondary Offering and was responsible for the distribution and sale of at least 1,213,333 of the shares sold in the Secondary Offering with respect to which the $0.75 per share underwriting discount resulted in total fees of $909,999.75.  For purposes of this Complaint, the term "Bear Stearns" shall refer to JPMorgan Chase & Co. as successor-in-interest to Bear, Stearns & Co. Inc.

36.    Defendant Cowen & Co., LLC, previously SG Cowen & Co., LLC (together, "Cowen"), is an investment banking firm that provides investment research, market trading services, private placements, mergers and acquisitions advisory services and equity and convertible debt financings.  Cowen maintains its principal executive offices at 1221 Avenue of the Americas, New York, New York 10020.  Cowen (at that time known as SG Cowen & Co., LLC) acted as an underwriter with respect to the IPO and was directly responsible for the distribution and sale of at least 803,207 of the shares sold in the IPO with respect to which the $0.98 per share underwriting discount resulted in total fees of $787,142.86.  In addition, Cowen acted as an underwriter in the Secondary Offering and was responsible for the distribution and sale of at least 1,213,333 of the shares sold in the Secondary Offering with respect to which the $0.75 per share underwriting discount resulted in total fees of $909,999.75.

37.    Defendant Deutsche Bank Securities, Inc. ("DBSI") is the U.S. investment banking and securities arm of German bank Deutsche Bank AG.  DBSI maintains its principal executive offices at 60 Wall Street, New York, New York 10005.  DBSI acted as an underwriter with respect to the IPO and was directly responsible for the distribution and sale of at least 1,606,416 of the shares sold in the IPO with respect to which the $0.98 per share underwriting discount resulted in total fees of $1,574,287.68.  In addition, DBSI acted as an underwriter in the Secondary Offering and was responsible for the distribution and sale of at least 1,213,333 of the shares sold in the Secondary Offering with respect to which the $0.75 per share underwriting discount resulted in total fees of $909,999.75.

38.    Defendant Banc of America Securities LLC ("BAS"), an affiliate of Bank of America Corporation, is an investment banking firm that provides trading and brokerage services, debt and securities underwriting and advisory services for public offerings.  BAS

maintains its principal executive offices at 9 West 57th Street, New York, New York 10019. BAS acted as an underwriter with respect to the IPO and was directly responsible for the distribution and sale of at least 1,606,416 of the shares sold in the IPO with respect to which the $0.98 per share underwriting discount resulted in total fees of $1,574,287.68. In addition, Bank of America Strategic Investments Corporation ("BASIC"), a corporate affiliate of BAS, offered 356,785 shares of GCAH common stock for sale in the IPO. BAS acted as an underwriter in the Secondary Offering and was responsible for the distribution and sale of at least 520,000 of the shares sold in the Secondary Offering with respect to which the $0.75 per share underwriting discount resulted in total fees of $390,000.

39.    Defendant Citigroup Global Markets LLC ("CGM") is the brokerage and securities arm of Citigroup, Inc., providing brokerage, investment banking, and asset management services to businesses, governments, and individuals. CGM maintains its principal executive offices at 388 Greenwich Street, New York, New York 10013. CGM acted as an underwriter with respect to the IPO and was directly responsible for the distribution and sale of at least 1,606,416 of the shares sold in the IPO with respect to which the $0.98 per share underwriting discount resulted in total fees of $1,574,287.68. In addition, CGM acted as an underwriter in the Secondary Offering and was responsible for the distribution and sale of at least 520,000 of the shares sold in the Secondary Offering with respect to which the $0.75 per share underwriting discount resulted in total fees of $390,000.

40.    Defendant Wachovia Capital Markets, LLC ("WCM") is the corporate and investment banking division of brokerage firm Wachovia Securities, LLC, which is part of Wachovia Corporation. Wachovia provides debt and equity underwriting, and trading, research, sales, loan syndications, corporate finance, and M&A advisory services. It maintains its

principal executive offices at 301 S. College Street, Charlotte, North Carolina 28288. WCM acted as an underwriter with respect to the IPO and was directly responsible for the distribution and sale of at least 803,207 of the shares sold in the IPO with respect to which the $0.98 per share underwriting discount resulted in total fees of $787,142.86. In addition, WCM acted as an underwriter in the Secondary Offering and was responsible for the distribution and sale of at least 520,000 of the shares sold in the Secondary Offering with respect to which the $0.75 per share underwriting discount resulted in total fees of $390,000.

41.    Defendants Goldman Sachs, JP Morgan, Bear Stearns, Cowen, DBSI, BAS, CGM, and WCM are collectively referred to herein as the "Underwriter Defendants."

### G.    Deloitte & Touche LLP

42.    Defendant Deloitte & Touche LLP ("Deloitte"), a "Big Four" accounting firm, is a Delaware limited liability partnership headquartered in New York. Deloitte and its various affiliates and member firms were directly, indirectly and/or collectively involved in auditing the Company's financial statements since 2000, and continued to serve in this role throughout the Class Period. Among other things, Deloitte audited the Company's financial statements that were included in the Registration Statement, Prospectus, Second Registration Statement, and Second Prospectus, and issued unqualified audit reports on those financial statements. Deloitte consented to the inclusion of its audit reports on the Company's financial statements in the Registration Statement and Second Registration Statement.

## IV.    CLASS ACTION ALLEGATIONS

43.    Plaintiff brings this action on behalf of itself and as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased or otherwise acquired GCAH common stock during the Class Period, either pursuant to, or traceable to, the IPO or Secondary Offering, and who suffered damages as a result of their

purchases (the "Class").  Excluded from the Class are: (1) the Defendants; (2) members of the immediate family of each of the Defendants; (3) the subsidiaries or affiliates of the Company or any of the Defendants; (4) any person or entity who is, or was during the Class Period, a partner, officer, director, employee or controlling person of the Company or any of the Defendants; (5) any entity in which any of the Defendants has a controlling interest; (6) the legal representatives, heirs, successors or assigns of any of the excluded persons or entities specified in this paragraph; and (7) the insurance carriers who provide directors' and officers' liability insurance to Company and/or any of the Defendants.

44.    The members of the Class are so numerous that joinder of all members is impracticable.  More than 28.6 million shares of GCAH stock were sold to public investors in the IPO and Secondary Offering and remain outstanding.  While Plaintiff does not know the exact number of Class members, Plaintiff believes that there are, at minimum, thousands of members of the Class who purchased GCAH's common stock during the Class Period.   The names and addresses of Class members can be ascertained from the books and records of the Company or its transfer agent, or from the Underwriter Defendants.

45.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

     a.     Whether the federal securities laws were violated by the Defendants' acts and omissions as alleged herein;

     b.     Whether the Prospectus, Second Prospectus, Registration Statement, and Second Registration Statement contained untrue statements of material fact and/or omitted material facts;

     c.     Whether the Defendants conducted a reasonable investigation giving them reasonable grounds to believe that the statements contained in the Prospectus, Second Prospectus, Registration Statement, and Second Registration Statement were true and that there was no omission to state a

material fact required to be stated therein or necessary to make the statements therein not misleading;

d.    Whether certain Defendants were "control persons" of GCAH at the time of the IPO and/or Secondary Offering;

e.    Whether, and by how much, the price of GCAH's common stock was artificially inflated during the Class Period as a result of the untrue statements or omissions complained of herein; and

f.    Whether the members of the Class have sustained damages, and if so, the proper measure thereof.

46.    Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation. Plaintiff has no interests that are adverse or antagonistic to the Class.

47.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all members of the Class is impracticable, and the expense and burden of individual litigation make it virtually impossible for the Class members individually to redress the Defendants' wrongful conduct. Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

## V.    **SUBSTANTIVE ALLEGATIONS**

### A.    **The Company's Business**

48.    GCA's business model is a simple one: it provides cash access and customer relationship marketing technologies to the gaming industry. The Company's products and services allow patrons at casinos and other gaming establishments to access cash through a variety of methods including ATM cash withdrawals, credit card cash advances, point-of-sale debit card transactions, check verification and warranty, and money transfers.

49.    More than 90% of GCA's revenues come from ATM, point-of-sale debit card, and credit card cash advance transactions.  GCA supplies the machines that allow patrons on the casino floors to access cash through these types of automated financial transactions.  Each time a patron uses one of GCA's machines to facilitate such a transaction, GCA collects a fee from that patron in the form of a surcharge.  GCA is then obligated by its contracts to divide that fee with both the casino or gaming establishment (in the form of a commission) and with other service providers involved in facilitating the transaction, such as Visa/Mastercard.

50.    By way of an example provided by the Company in its Prospectus, in a typical $100 ATM cash withdrawal, GCA might charge the patron a surcharge of $2.50.  The patron's bank account would be debited $102.50, the patron would receive $100 at the machine, and the $2.50 surcharge would be transferred from the patron's bank account to GCA.  GCA would also receive an additional fee of approximately $0.50 from the patron's bank, and so GCA's total revenue from this transaction would be $3.  A portion of that $3 would then be paid in the form of a commission to the casino (80% of the $2.50 surcharge, in GCA's example), leaving GCA with $1.  After subtracting all of GCA's other operational costs and expenses (*e.g.*, machine maintenance, processing costs, salaries and benefits, etc.) from the $1, the balance would be GCA's profit.

51.    For the most part, the fees charged by banks and/or Visa/Mastercard were fixed, expected, and predictable.  The fees charged by the casinos in the form of commissions, however, were negotiated and typically controlled by multi-year contracts that were put up for bid by the gaming establishment.  Landing contracts with large casinos and other gaming operators with a significant number of cash access patrons was critical to GCA's success.  GCA

needed to get its products and services on the casino floor in order for it to generate revenues and to grow.

52.    Gaining access to the casino floor was no easy task.  The cash access industry in which GCA operated was highly competitive, and when large casinos and other gaming establishment operators put out requests for proposals (RFPs) to cash access service providers, the negotiations were fierce and typically centered on price (*i.e.*, the commissions that GCA and its competitors were willing to pay the casino to land the contract).  Additionally, GCA was (and is) subject to extensive governmental gaming regulation.

53.    By 2004, GCA was competing well in its niche industry, and was by far the leading provider of cash access services to the gaming industry.  GCA had managed to land exclusive contracts with at least seven of the top ten gaming establishments in the United States and the top four in the United Kingdom.  In addition, GCA was developing or already offered what appeared to be an impressive array of innovative, patented technologies which it boasted would assure its dominant market position for years to come.

54.    With the gaming industry growing, and large casino operators undergoing rapid consolidation and cost cutting, the Company's competition in the cash access industry intensified in 2004 and 2005.   Despite GCA's industry-leading products and services, it (like its competitors) was forced to aggressively price its contracts in order to win business, as it had little bargaining power against the much-larger casino operations.  Such aggressive pricing had a major drawback:  it dramatically cut into the Company's profit margins, which were increasingly squeezed by large, and growing, commissions payable to the casinos (reaching 80% and even beyond).

55.     As a result of the intense competition and escalating commissions, investors and analysts focused on the Company's profit margins (calculated by dividing net income by revenue) as a key metric for assessing its likely future performance.  Investors and analysts alike realized that in this competitive landscape the Company's profit margins were under pressure. GCA attempted to address the perceived softening of its profit margins by devising a strategy to develop and promote new, higher-margin products and to gain entry into international markets, where profit margins were higher.  GCA also aggressively sought to control operating expenses, so as to temper the impact of the inevitable commissions that were necessary to win casino business in the first place.  However, despite these potential new markets and new products, *90% or more* of GCA's business remained focused on ATM cash advances, credit card cash advances, and point-of-sale debits, all of which were low profit-margin operations to begin with and whose margins were particularly susceptible to further deterioration on account of the increased commissions being demanded by casinos to win or renew contracts.  Accordingly, investors and analysts remained focused on the Company's profit margins as a key metric.

### B.     The Company Under-Prices The Competition To Win Business

56.     Because the bulk of GCA's business remained focused in those areas subject to the risk of higher commissions, during 2004 through 2006 GCA found itself competing in this intensely competitive pricing environment to not only keep its current roster of customers, but also to expand and grow its operations by winning new customers.  Accordingly, GCA met the competition head on and priced its contracts aggressively enough to keep or win the business.

57.     GCA's aggressive under-pricing of its competition to retain and win business allowed GCA to portray itself as a fast growing and dominant market leader in the cash access space.  According to JP Morgan analyst Tien-tsin Huang, when GCA went public it was able to boast that "[o]ver the past two years [prior to November 2005], the company has a 97% renewal

rate and a 60% win rate on new contracts up for bid, providing strong revenue and earnings visibility."  According to Deutsche Bank analyst Christopher Mammone, in a February 2006 report, 2005 was a particular good year for GCA, which had announced a whopping 132 new contract wins, and of the 125 contracts it had up for renewal, it had lost only four.

58.     However, to win and renew its business at this high rate, GCA had to offer casino operators a higher commission split when bidding and renewing contracts, resulting in declining gross margins.  GCA's commission expenses skyrocketed in 2004 and 2005 and cut heavily into its revenues.  In each of its reported quarterly and year end financial results for 2005 and 2006, GCA stated that its commissions were "the largest component of cost of revenues" and that it "expect[ed] commissions to increase as a percentage of revenue as new contracts are signed or existing contracts are renewed."

59.     Because of the perception that GCA had aggressively under-priced its contracts with casino customers to win business, the issues surrounding the Company's profit margins and its costs of revenues in the form of commissions continued to intensify.  Ahead of its planned IPO, analysts and investors alike were focused more than ever on whether GCA could maintain its profit margins despite its apparent willingness to shoulder a higher burden of customer commissions.  However, the true size of the Company's commission expense was even larger than what was disclosed to investors, as a result of purported miscalculations and underreporting of commission payments that would be revealed only years later.

### C.      GCAH Conducts An IPO

60.     It is against this backdrop and in this competitive landscape that, in 2005, the Insider Defendants and the Insider Selling Entities, with the support and participation of the Underwriter Defendants, took GCAH public through an IPO.

61.    GCAH first filed a Form S-1 registration statement on March 22, 2005. Amendments were later filed, including a Form S-1/A registration statement dated May 26, 2005; a Form S-1/A registration statement dated September 6, 2005; a Form S-1/A registration statement dated September 16, 2005; a Form S-1/A registration statement dated September 20, 2005; and a Form S-1/A registration statement dated September 22, 2005. The Registration Statement became effective on September 22, 2005, and the IPO was launched pursuant to a Prospectus dated September 22, 2005, which was filed with the SEC on September 23, 2005.

62.    The Underwriter Defendants and the Company conducted a road show for the IPO, during which representatives of the Company visited and made presentations to potential investors in an effort to drum up interest in the stock and to support a high IPO price. The road show was well-received, allowing GCAH to price its stock at $14.00 per share, which was the high end of the contemplated range.

63.    On or about September 22, 2005, 16,064,157 shares of GCAH common stock were offered and sold to Plaintiff and other members of the investing public in the IPO. Of those shares, 9,000,000 were offered by the Company and 7,064,157 were offered by selling stockholders including Defendants M&C (owned and controlled by Defendants Maskatiya and Cucinotta) and Summit (whose various affiliated entities are managed and controlled by Defendants Kortschak and Fitzgerald). In October 2005, an additional 2,219,224 shares of common stock covered by an over-allotment option (*i.e.,* a "green shoe" option) granted to the Underwriter Defendants were also sold as part of the IPO, with 1,053,568 such shares being offered and sold by GCAH, and the remaining 1,165,656 shares being offered and sold by M&C and Summit. All such shares were sold pursuant to the Prospectus. In total, the IPO raised more than $256 million in gross proceeds from members of the investing public, with the Company

receiving over $130 million, and the remaining $126 million being distributed amongst the underwriters and the insider selling stockholders

64.     Defendants Sanford, Maskatiya, Cucinotta, Kortschak, Fitzgerald, Hagerty Kilburn and Harris each signed the Registration Statement, either personally or through an attorney-in-fact.

65.     The Prospectus and Registration Statement contained financial statements and other representations regarding the Company and its business and financial performance that purported to demonstrate the Company's soundness.  The year-to-year results of GCA, as reflected in the Prospectus and Registration Statement, were strong and attractive to analysts and investors.  For example, the Company stated that GCA's net income and revenues had ballooned from $58 million in net income on $356 million in revenues in 2003 to $255 million in net income on $403 million in revenues in 2004, and that its earnings per share (diluted) had increased from $0.82 in 2003 to $3.56 in 2004.  Such figures – including an almost $200 million increase in net income, and an apparent dramatic reduction of operational expenses from almost $300 million to less than $150 million year-to-year – signaled to investors that the Company was not only growing rapidly, but was becoming more efficient by obtaining better profit margins and reducing its costs of revenues.

66.     The Prospectus and Registration Statement described GCA's business and indicated how its revenues were generated from the surcharges it assessed to patrons in gaming establishments.  According to the Prospectus and Registration Statement, the Company's largest cost of revenues was the commissions that GCA paid to gaming establishments for the right to put its equipment on the premises.  The second largest cost was interchange fees, *i.e.*, fees paid to

Visa, Mastercard and the like for association fees and services that they provided in facilitating

cash access transactions.

67.     The Prospectus and Registration Statement described the Company's revenues,

cost of revenues, and gross profits for the six-month period ended June 30, 2005, as follows:

> Total revenues for the six months ended June 30, 2005, were
> $222.1 million, an increase of $27.0 million, or 13.9%, as
> compared to the six months ended June 30, 2004.…

> \*               \*               \*

> … Cost of revenues increased 14.1% from $130.4 million to
> $148.7 million. The largest component of cost of revenues is
> commissions, and commissions increased 10% in the 2005 Period
> as contracts were signed or renewed at higher commission rates
> than experienced in the 2004 period, due to competitive
> pressures.… We expect that commissions, due to competitive
> pressures, and interchange will continue to increase, and we expect
> that in the balance of 2005 cost of revenues will increase at a rate
> faster than revenues.

> Primarily as a result of the factors described above, gross profit
> increased 13.5%, from $64.7 million to $73.4 million. We expect
> that, even though cost of revenues will grow more rapidly than
> revenues, gross profit for the final three quarters of 2005 will be
> higher than in the comparable 2004 period.

68.     In the Prospectus and Registration Statement, the Company also identified certain

risk factors relating to, among other things, its customer relationships and the competitiveness of

its industry:

### Risk Related to Our Business

> **If we are unable to maintain our current customers on terms
> that are favorable to us, our business, financial condition and
> operating results may suffer a material adverse effect.**

> … We are typically required to renegotiate the terms of our
> customer contracts upon their expiration, and in some
> circumstances we may be forced to modify the terms of our
> contracts before they expire.  When we have successfully renewed

26

these contracts, these negotiations have in the past resulted in, and in the future may result in, financial and other terms that are less favorable to us than the terms of the expired contracts. In particular, we are often required to pay a higher commission rate to a gaming establishment than we previously paid in order to renew the relationship. Assuming constant transaction volume, increases in commissions or other incentives paid to gaming establishments would reduce our operating results. We may not succeed in renewing these contracts when they expire, which would result in a complete loss of revenue from that customer, either for an extended period of time or forever. Our contracts are often global, in that they cover all of the gaming establishments of a particular operator wherever they are located around the world. ***So, the loss of a single contract often results in the loss of multiple gaming establishments. If we are required to pay higher commission rates or agree to other less favorable terms to retain our customers or we are not able to renew our relationships with our customers upon the expiration of our contracts, our business, financial condition and operating results would be harmed.***

**Because of significant concentration among our top customers, the loss of a top customer could have a material adverse effect on our revenues and profitability.**

In 2004 and the six months ended June 30, 2005, our five largest customers … accounted for approximately 38.0% and 37.5%, respectively, of our revenues. In 2004 and the six months ended June 30, 2005, revenues attributable to our largest customer … were approximately 11.7% and 11.2%, respectively, of our revenues. In June 2005 [our largest customer] acquired [another customer]. On a pro forma basis, the combined entity would have accounted for 20.4% and 18.5% of our revenues for the year ended December 31, 2004 and the six months ended June 30, 2005, respectively. ***The loss of, or a substantial decrease in revenues from, any one of our top customers could have a material adverse effect on our business and operating results.***

\*       \*       \*

**Competition in the market for cash access services is intense which could result in higher commissions or loss of customers to our competitors.**

The market for cash access products and related services is intensely competitive … Other providers of cash access products and services to gaming establishments have in the past increased,

and may in the future continue to increase, the commissions or other incentives they pay to gaming establishments in order to win those gaming establishments as customers and to gain market share. ***To the extent that competitive pressures force us to increase commissions or other incentives to establish or maintain relationships with gaming establishments, our business and operating results could be adversely affected.***

(emphasis added).

69.     As would be revealed only much later – after completion of the IPO as well as a subsequent Secondary Offering – the risk of GCA losing significant customers was much more immediate and severe than these disclosures suggested, because the Company was miscalculating (and therefore underpaying and misreporting) commissions payable to its customers, which, if discovered by those customers, was likely to lead them to take their business to the Company's competitors. This miscalculation and misreporting of commissions also caused the Company's commission expense and cost of revenues, as reported in the Prospectus and Registration Statement, to be understated, thus overstating the Company's gross profits and profit margins.

### D.    GCAH Completes Its Secondary Offering

70.     As part of the IPO, the Insider Defendants and the Insider Selling Entities agreed to a 180-day lock-up period during which they were not permitted to sell additional GCAH shares. Shortly after the expiration of the 180-day lock up, however, the Insider Defendants and the Insider Selling Entities further monetized their investments in the Company by conducting a Secondary Offering of GCAH shares.

71.     On May 25, 2006, the Secondary Offering of an additional 10.4 million shares of its common stock at a price of $15.75 per share was completed. All of the shares in the Secondary Offering were offered by selling stockholders (*i.e.*, the Company did not receive any proceeds from the shares sold in the Secondary Offering) who received $15 per share in proceeds

(over $150 million total), with the remaining $0.75 per share going to the Underwriter Defendants. Among the insider selling stockholders were M&C and Summit, which each sold 4,215,810 shares for over $66 million apiece; Sanford, who sold 300,000 shares for $4.5 million; and Hagerty, who sold 100,000 shares for $1.5 million.

72. The Secondary Offering was conducted pursuant to the Second Prospectu dated May 25, 2006, and filed with the SEC on May 26, 2006. The shares that were sold in the Secondary Offering were registered pursuant to the Second Registration Statement, which was first filed as a Form S-1 Registration Statement dated May 11, 2006, and was later amended through Form S-1/A Registration Statements dated May 18, 2006, and May 24, 2006. The Second Registration Statement became effective on May 25, 2006.

73. Defendants Sanford, Maskatiya, Cucinotta, Kortschak, Fitzgerald, Hagerty, Kilburn and Harris each signed the Second Registration Statement either personally or through an attorney-in-fact.

74. The Second Prospectus and the Second Registration Statement included the Company's audited consolidated financial statements for 2003, 2004 and 2005, as well as Deloitte's clean and unqualified audit report on those financial statements which stated: "In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Global Cash Access Holdings, Inc. and subsidiaries at December 31, 2005 and 2004, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2005, in conformity with accounting principles generally accepted in the United States of America." Deloitte's audit report also stated: "We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United

States).    Those standards require that we plan and perform the audit to obtain reasonable

assurance about whether the financial statements are free of material misstatement."

75.    Like the Prospectus and Registration Statement, the Second Prospectus and

Second Registration Statement described GCA's business and stated that the largest costs of

revenues are the commissions that GCA pays to the gaming establishments where its products

and services are offered.

76.    The Second Prospectus and Second Registration Statement described the

Company's revenues and cost of revenues for the year ended December 31, 2005, as follows:

> Total revenues for the year ended December 31, 2005 were $454.1
> million, an increase of $51.1 million, or 12.7%, as compared to the
> year ended December 31, 2004….
>
> … Cost of revenues (exclusive of depreciation and amortization)
> increased 14.4% from $270.1 million [in 2004] to $309.0 million.
> The largest component of cost of revenues (exclusive of
> depreciation and amortization) is commissions, and commissions
> increased 11.4% in 2005 as contracts were signed or renewed at
> higher commission rates than experienced in 2004.

77.    The Second Registration Statement and Second Prospectus also included financial

data for the quarterly period ended March 31, 2006, stating:

> Total revenues for the quarter were $129.8 million, an increase of
> $20.2 million, or 18.4%, as compared to the quarter ended March
> 31, 2005….
>
> … Cost of revenues (exclusive of depreciation and amortization)
> increased 26.1% from $72.5 million to $91.4 million [from the first
> quarter of 2005 to the first quarter of 2006].    The largest
> component of cost of revenues (exclusive of depreciation and
> amortization) is commissions, and commissions increased 26.2%
> in the 2006 quarter as contracts were signed or renewed at higher
> commission rates than experienced in the 2005 quarter….

78.    The Second Registration Statement and Second Prospectus contained similar "risk

factor" disclosures as the Registration Statement and Prospectus, but again did not disclose that

there was a substantial likelihood of those risks materializing due to the ongoing underpayment and misreporting of commissions to customers:

### Risks Related to Our Business

**If we are unable to maintain our current customers on terms that are favorable to us, our business, financial condition and operating results may suffer a material adverse effect.**

… We are typically required to renegotiate the terms of our customer contracts upon their expiration, and in some circumstances we may be forced to modify the terms of our contracts before they expire.  When we have successfully renewed these contracts, these negotiations have in the past resulted in, and in the future may result in, financial and other terms that are less favorable to us than the terms of the expired contracts.  In particular, we are often required to pay a higher commission rate to a gaming establishment than we previously paid in order to renew the relationship.  Assuming constant transaction volume, increases in commissions or other incentives paid to gaming establishments would reduce our operating results.  We may not succeed in renewing these contracts when they expire, which would result in a complete loss of revenue from that customer, either for an extended period of time or forever.  Our contracts are often global, in that they cover all of the gaming establishments of a particular operator wherever they are located around the world.  ***So, the loss of a single contract often results in the loss of multiple gaming establishments.  If we are required to pay higher commission rates or agree to other less favorable terms to retain our customers or we are not able to renew our relationships with our customers upon the expiration of our contracts, our business, financial condition and operating results would be harmed.***

**Because of significant concentration among our top customers, the loss of a top customer could have a material adverse effect on our revenues and profitability.**

In 2005, our five largest customers … accounted for approximately 40.4% of our revenues.  In June 2005 [our largest customer] acquired [another customer].  The combined entity would have accounted for 17.9% of our revenues for the year ended December 31, 2005 and 17.7% in the three months ended March 31, 2006.  ***The loss of, or a substantial decrease in revenues from, any one of our top customers could have a material adverse effect on our business and operating results.***

31

\*        \*        \*

**Competition in the market for cash access services is intense which could result in higher commissions or loss of customers to our competitors.**

The market for cash access products and related services is intensely competitive … Other providers of cash access products and services to gaming establishments have in the past increased, and may in the future continue to increase, the commissions or other incentives they pay to gaming establishments in order to win those gaming establishments as customers and to gain market share. ***To the extent that competitive pressures force us to increase commissions or other incentives to establish or maintain relationships with gaming establishments, our business and operating results could be adversely affected.***

(emphasis added).

**E.    After The IPO And Secondary Offering Are Completed, The Company Discloses Significant Deficiencies In Its Internal Controls And Existing Litigation Over Customer Commission Payments**

79.    When the Company went public through the IPO, it reported no internal control deficiencies of any kind, and disclosed nothing that would alert a reasonable investor to the fact that the Company was failing to properly account for its customer commissions which represented its largest cost of revenues.

80.    On May 11, 2006, just a few weeks before the Secondary Offering, the Company filed a Form S-1 Registration Statement that mentioned for the first time that Deloitte had identified "a number of control deficiencies" in connection with its audit of the Company's 2005 year-end results. The Company made a similar disclosure in its First Quarter 2006 Form 10-Q report, issued just days later on May 15, 2006. However, neither disclosure gave any indication that the unspecified control deficiencies amounted to "*material* weaknesses" or "*significant* deficiencies" in internal controls. Moreover, the Company had already filed its Form 10-K Annual Report for 2005 (the "2005 Annual Report") which (a) made no mention of any control

deficiencies, (b) contained a clean and unqualified audit report from Deloitte, and (c) contained certifications from Defendants Sanford and Hagerty whereby they personally attested to the effectiveness of the Company's internal controls and procedures and to the Company's reported results in the 2005 Annual Report. Accordingly, there was no reason for potential investors in the Secondary Offering – who relied upon the Underwriter Defendants and Deloitte to test the accuracy of the offering materials and the effectiveness of the Company's internal controls – to believe there was a serious problem with the Company's internal controls.

81.    On August 14, 2006, less than three months after the consummation of the Secondary Offering, the Company reported its second quarter 2006 results by filing its Form 10-Q Report for the quarter (the "2Q 2006 Report"). In the 2Q 2006 Report, the Company disclosed for the first time that it had been engaged in litigation since March 2006 – *i.e.*, since before the Secondary Offering – with "the subsidiaries of a former customer" relating to disputes over unpaid commissions, and had paid $200,000 to settle that litigation in July 2006. According to the Company's 2Q 2006 Report, the subsidiaries of a former customer alleged that "commissions were owed following the expiration of our agreements…" This litigation was not disclosed in the Secondary Prospectus or Secondary Registration Statement.

82.    On March 30, 2007, the Company filed its 2006 Annual Report on Form 10-K with the SEC. Under "ITEM 9A. CONTROLS AND PROCEDURES" the Company stated that, as required by law, "our management with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the design and operating effectiveness of our disclosure controls and procedures as of December 31, 2006.….[and] [b]ased on this evaluation our Chief Executive Officer and Chief Financial Officer concluded that, because of *material weaknesses* in our internal control over financial reporting…our disclosure controls and procedures *were not*

*effective*." (emphasis added).   These internal control problems were described in the 2006

Annual Report as follows:

> The specific material weaknesses identified by management as of December 31, 2006 are described as follows:
>
> •  Ineffective controls related to staffing in finance and accounting:  During 2006, we had a high level of turnover of personnel in our finance and accounting staff, which resulted in certain controls not operating effectively as of December 31, 2006.
>
> This material weakness did not result in a material adjustment to our 2006 consolidated financial statements but did contribute significantly to the following internal control deficiencies each of which is considered to be a material weakness:
>
> •  Ineffective control related to the reconciliation and analysis of accounts:  The control designed to ensure the timely and accurate preparation, review and approval of account analyses and reconciliations did not operative effectively. Specifically, certain reconciliations and analyses were not performed in a timely manner.
>
> •  Ineffective controls related to the financial reporting close process:  Certain controls designed to ensure the timely and accurate preparation, review and approval of our accounts and financial statements did not operate effectively. Specifically, 1) systematic controls were not in place to segregate the preparation and review of journal entries, 2) certain journal entries were not properly reviewed and approved in accordance with Company policy, 3) certain checklists were not maintained or reviewed and approved by appropriate finance and accounting personnel, and 4) we were unable to adhere to our pre-determined closing and reporting calendar.
>
> •  Ineffective controls related to income taxes:   Certain controls designed to ensure the timely and accurate calculation of our provision for income taxes did not operate effectively.  Certain matters affecting our income tax provision were not identified on a timely basis by finance and accounting personnel  Further, our process to timely and accurately quantify temporary differences did not operate effectively.

- Ineffective controls related to the accounts payable process: Certain controls designed to ensure the timely and accurate disbursement of Company funds did not operate effectively. Specifically, 1) certain disbursements were not properly reviewed for appropriate coding and cut-off and 2) the vendor master file was not reviewed by finance and accounting management for pertinence and accuracy.

- ***Inadequate controls related to commissions: We did not have appropriate internal control design related to how we calculate the amount of commissions we pay our customers. Specifically, 1) internal controls over commission set-up did not include a comparison of commission rates to contractual terms and 2) there was an ineffective process to determine the appropriate commission type and amount. In addition, some of the databases and applications used to maintain transaction records and perform certain commission computations were maintained by a third party, and appropriate controls to monitor and approve changes and to limit access were not in place.***

(emphasis added).

83.    These material weaknesses in GCA's internal controls were present at the time of both the IPO and Secondary Offering, but were not disclosed in any of the offering documents. Defendants' failure to detect and/or disclose these material weaknesses, and their impact upon the Company's reported financial results and future business prospects at the time of the IPO and Secondary Offering, was negligent.

## VI.    THE TRUTH ABOUT THE COMPANY'S MISCALCULATION AND MISREPORTING OF COMMISSION PAYMENTS BEGINS TO EMERGE

84.    As set forth above, the Company's improper commission calculations and payouts, and their impact on the Company's financial statements and operational results, was concealed and went undisclosed as Company insiders and others involved in GCAH's successful IPO and Secondary Offering reaped huge profits. Indeed, the truth did not begin to emerge until

after both the IPO and Secondary Offering, when, on November 14, 2007, the Company revealed

that a whistleblower had come forward and exposed GCA's commission problems.

85.    On November 14, 2007, the Company stunned the market when it announced that

it was delaying the filing of its Form 10-Q Quarterly Report for the period ending September 30,

2007 (the "3Q 2007 Report"), due to an internal investigation spawned by a whistleblower's

allegations.  The Company announced that an independent committee of the Board had been

formed and that independent counsel (later revealed to be the law firm of Skadden Arps Slate

Meagher & Flom) had been hired to assist in the investigation.  While no further details were

revealed, GCA's stock price plummeted, losing 60% of its value in one trading day and

obliterating over $400 million in market capitalization.

86.    Analysts and investors would have to wait nearly a month (until December 7,

2007) before management addressed the public again with respect to the investigation, and the

stock price traded down to an historic low of $3.00 per share on December 5, 2007.  On

December 7, 2007, GCA's new CEO, Scott Betts ("Betts"), hosted a conference call with

analysts in an effort to stem the tide.  Betts revealed during this conference call that the

whistleblower's allegations had surfaced on November 9, 2007, and involved the so-called

"miscoding" of commissions for the purpose of avoiding certain transaction fees, and that the

investigation into the miscoding allegation had been broadened to include an internal review of

the Company's calculation of commissions.  Betts informed analysts that, in addition to the

Skadden Arps law firm, the Company had retained KPMG LLP to assist in the investigation.

Although the investigation remained ongoing, Betts described the results so far as follows:

> To date, the internal review has uncovered issues in the calculation
> of certain commissions payable to approximately 20 of our
> customers. And issues with the reporting of transactions for these
> customers and approximately 120 other customers. Let me put

these numbers into perspective. We have over 1,000 customers in total. And as I just said, we have 20 customers where we have issues with the commission payments, and another 120 where we have found issues with reporting of transactions.

… Although the internal review has not yet been completed, based upon its progress to date the Company estimates that the amount of payments to resolve these commission calculation issues should be in the range of 3 to $4 million.

As for the transaction reporting issues, the Company needs to review this on a customer-by-customer basis. We just haven't had time to do this work yet. Again based upon our work to date, the Company estimates that the impact to us to resolve these commission issues, fix our system, and resolve the transaction reporting issues should not exceed more than $10 million.

Please note we are early in this process, so the accounting consequences of this finding, and treatment of these payments, nor their final amount has yet been determined. There are other allegations that are currently under investigation, but to avoid publicly disclosing allegations that may not be substantiated, we have chosen to keep those allegations confidential.

87.    When asked by analysts on the conference call whether the estimated $3 to $4 million came in a particular quarter or over a set time period, and what the $3 to $4 million estimate implied in terms of its impact on the Company's gross margins, Betts had no answers to provide.

88.    In a research report issued on December 7, 2007, after the conclusion of the call, a DBSI analyst expressed serious discomfort in a research report:

**What we still do not know.**  Though GCA's $10mm all-in est. suggests that its financial exposure is likely to be ltd, there are too many unknowns associated w/ the ongoing investigation to put us completely at ease.  At this point, it is unclear how many of GCA's top clients may have been affected or if this type of event could trigger an exit clause in those customers' contracts.  Though GCA did not change its 2007 outlook, the fact that guidance is likely based on the same flawed methods for calc. commissions and reporting transactions questions the reliability of this outlook, in our view.  We do not yet know whether the issues uncovered will

> warrant a financial restatement. We also note there are other
> pieces of the investigation that remain confidential. Add to this
> the series of missteps by the co. prior to the internal investigation, and
> we remain on the sidelines for now. Maintain Hold.

89.     These disclosures of November and December 2007 struck a nerve with analysts

and investors who had been conditioned to believe that the most significant risk to the

Company's success were the downward trends on gross margins created by the intensely

competitive cash access business environment, and the potential loss of major customers. The

partial disclosures by the Company muddied the waters with respect to the Company's real gross

margins, and strongly suggested that the Company may not be as profitable as was originally

portrayed. Analysts and investors were rattled because these revelations, and their potential

impact on the Company's prospects going forward, presented serious, material risks that had

previously been concealed from the investing public.

90.     On December 21, 2007, GCAH announced in a press release that its investigation

was complete, reaffirming its estimate that the costs of resolving the commission calculation

issues would be approximately $3.3 million.

91.     On January 30, 2008, the Company filed its delayed 3Q 2007 Report, confirming

that the Company's "estimated" all-in costs resulting from the investigation were slightly under

the $10 million guidance previously provided by the Company, and describing the outcome of

the investigation as follows:

> As a result of inquiries made during the internal investigation, the
> Company reviewed and considered the interpretation of contract
> clauses relating to the calculation of commissions payable to
> certain of the Company's customers in connection with certain
> types of transactions, and the reporting of certain types of
> transactions to certain of the Company's customers. As a result of
> this review, the Company may provide certain customers with
> augmented monthly transaction reporting for the period from 2005
> through 2007 for transactions completed on ATMs and automated

cashier machines. In reviewing the commission computation provisions of the customer contracts, the Company has identified a number of customer contracts during the period from 2005 through 2007 that contain commission computation provisions that may be subject to varying interpretations… ***[W]e believe that it is probable that there will be disputes between us and the relevant customers regarding the amounts we actually paid. Based upon our analysis, we believe it is probable we will incur $2.6 million of additional expense to settle commission disputes.*** We have recorded these costs as additional commission expense, which is a cost of revenue, for the quarter ending September 30, 2007. Of this amount, $1.9 million relates to transactions completed in 2005 and 2006 and $0.5 million relates to transactions completed during the six months ended June 30, 2007.

(emphasis added).

92.     Also in its 3Q 2007 Report, and no doubt anticipating its litigation position, the Company predicted that the financial impact was immaterial, thus not requiring a restatement of prior reported financial results. Nevertheless, the Company admitted that the true financial impact remained uncertain, as follows:

It is reasonably possible that we will be required to pay additional amounts to settle commission disputes related to our reporting of commissionable transactions. We can not currently estimate the ultimate costs to resolve these issues, but do not expect these to have a material adverse effect on our business, cash flows, results of operations or financial position.

93.     In its 2007 Annual Report on Form 10-K, filed on March 17, 2008, the Company indicated that it had by that time identified undisclosed "issues with the payment of certain commissions to twenty-two of [its] customers during the period from 2005 through 2007." The Company ticked up its "probable" estimated impact by another $300,000, and warned that failure to resolve these customer disputes could result in the loss of customers:

We believe that it is probable we will incur $2.9 million in costs to resolve any commission calculation for the relevant customers. To the extent other customers dispute our commission calculations, or customers refuse to resolve their commission calculation disputes

with us for the amounts we propose, we may be required to make payments in excess of $2.9 million to resolve such disputes. ***If we are unable to resolve these disputes, we may lose customers or become subject to costly litigation.***

*     *     *

It is reasonably possible that we will be required to pay additional amounts to settle commission disputes related to our reporting of commissionable transactions. We can not currently estimate the ultimate costs to resolve these issues, but do not expect these to have a material adverse effect on our business, cash flows, results of operations or financial position.

(emphasis added)

94.     The dramatic fall in the price of the Company's securities after November 14, 2007, and the damages suffered by Plaintiff and members of the Class, were a direct and proximate result of the disclosure to investors and the market of the untrue statements and omissions of material facts described herein. GCAH's stock has never fully recovered from its precipitous decline following the November 14, 2007 disclosure of the "investigation" that led to the Company's admission that it had been calculating and paying commissions improperly.

## VII.    THE REGISTRATION STATEMENTS AND PROSPECTUSES CONTAINED UNTRUE STATEMENTS AND OMITTED FACTS THAT WERE MATERIAL TO INVESTORS

95.     The Prospectus, Registration Statement, Second Prospectus and Second Registration Statement contained untrue statements of material fact and/or omitted to state material facts necessary to make the statements therein not misleading. Among other things, they failed to disclose that: (a) the Company's internal controls were deficient, nonexistent, or ignored, causing or allowing the Company to inaccurately calculate the amount of commissions payable to the company's customers; (b) the Company had improperly computed the amount of commissions it was required to pay and report to many of its customers, resulting in the Company failing to comply with contractual terms and subjecting the Company to a material risk

of significant customer loss; and (c) due to the improper calculation and misreporting of commissions, the Company's cost of revenues during at least 2005 and 2006 (including the interim reporting periods) was understated, resulting in an overstatement of profit margins, net income, and earnings per share; and (d) as of the date of the Secondary Offering, the Company was already embroiled in litigation with a former customer over the alleged non-payment of commissions.

96.     Although the Company disclosed certain "risk factors" in its offering documents, such as the risk of losing customers, it failed to disclose that it was engaged in activity that created a strong likelihood of these risks materializing in the near term – namely, that the Company was underpaying and/or inaccurately reporting commissions to at least 140 of its customers, and that if these activities came to light they would result in increased commission expense (and thus lower profit margins) and a strong possibility of losing customers to the Company's competitors.  As the Company revealed only after the IPO and Secondary Offering were completed, it had underpaid commissions owed to 22 customers and misreported commissions payable to those customers and 120 others, and as a result of this improper payment and calculation of commissions, it had understated its commission expense by *at least* $1.9 million with respect to transactions completed in 2005 and 2006 and $200,000 with respect to transactions completed prior to 2005.  However, the Company has acknowledged that it is "reasonably possible" that these numbers will increase as disputes with additional customers are resolved.

97.     Irrespective of the dollar value of the Company's misstatement of commission expense and cost of revenues, the Company's undisclosed material weaknesses in internal control, its commission calculation and reporting errors, and its ongoing litigation (at the time of

the Secondary Offering) regarding commissions payable, were all material facts to Plaintiff and other Class members who purchased the Company's stock during the Class Period, as evidenced by the fact that GCAH's stock continues to trade down more than 60% from its IPO price even after the Company's disclosures of the estimated financial impact of its commissions payment and reporting issues.

98.    In particular, these undisclosed facts were material to investors' understanding of the risks associated with investing in GCAH's stock.  The Company has for years noted to investors the importance of commissions expense to its profits and future growth potential.  The Company repeatedly disclosed that the commissions it paid to its casino customers were its single largest cost of revenues, and the Company derived over 90% of its revenues from its lowest margin business with ATM, point-of-sale debit, and credit card cash advances.  The Company acknowledged that its commissions payable were likely to increase as a result of increased competition, and identified its increasing commissions payable as a risk factor to investing in GCAH stock.  Accordingly, analysts and investors were intently focused upon the Company's commission expense and gross profit margin.  Information indicating that the Company's commission expense was being understated would have been material to investors' decision-making.

99.    The Company also identified the potential of losing a large customer as a serious risk that could have "a material adverse impact on our revenues and profitability."  The Company's largest customer accounted for nearly 20% of its business, while a close to 40% of its business was concentrated in its top five customers.  As DBSI analysts wondered aloud when the Company released the partial results of the internal investigation, "it is unclear how many of GCA's top clients may have been affected or if this type of event could trigger an exit clause in

those customers' contracts."  In light of the intensely competitive landscape in the cash access business, moreover, many wondered whether GCA's issues might create just enough of an opening or an edge for a competitor to win new business or take away a large GCA client, and this uncertainty was reflected in a significant drop in the stock price.  Had any reasonable investor known prior to purchasing GCAH stock that the Company was cheating its customers out of commissions and thereby putting the Company in imminent jeopardy of losing customers, they would have considered that information material to their investment decisions.

100.    In sum, the facts that were misstated and omitted in the Prospectus, Registration Statement, Second Prospectus, and Second Registration Statement regarding the Company's commission expenses were material to investors because they concealed the severity of the risks facing the Company's ability to continue to successfully competing in the highly competitive cash access industry.

## VIII.  DEFENDANTS' NEGLIGENCE WITH REGARD TO THE OFFERING MATERIALS FOR THE IPO AND SECONDARY OFFERING

### A.    The Company, the Insider Defendants, the Director Defendants and the Insider Selling Entities

101.    As the Insider Defendants, the Director Defendants and the Insider Selling Entities were well aware, commissions were GCA's largest cost of revenues and because such commissions were on the rise, GCA's profit margins were under enormous pressure.  These Defendants also knew that analysts and investors were keenly focused on GCA's profit margins as the most telling barometer of the Company's performance and likelihood of its future growth and success.  For example, in a conference call with analysts on May 2, 2006, CFO Hagerty acknowledged that GCA's issues with gross profit margins made investors "nervous" and thus "one of the questions that's top on [investors'] list is, tell us about gross margins?"  Hagerty assured analysts that the Company had "some ways to ameliorate the situation [of deteriorating

gross margins]…but the business is in good shape.  And we would not want concerns about gross margin to cloud what's fundamentally a very positive situation for the business."

102.    The Insider Defendants by virtue of their executive management positions, their positions as members of the Board of Directors of the Company, and their long history at the Company and deep knowledge of its operations, had unfettered access to non-public information regarding the Company's business, operations, operational trends, finances, and present and future business prospects.  The Director Defendants through their membership on the Board and the Audit Committee (with oversight responsibility over the Company's internal controls), and the Insider Selling Entities through their substantial ownership of the Company and their representation on the Board (through Defendants Maskatiya, Cuccinotta, Korschak, and Fitzgerald) and on the Audit Committee (through Defendants Korschak and Fitzgerald), also had ready access to such information.

103.    By virtue of their positions and their unfettered access to Company information, the Insider Defendants, the Director Defendants and the Insider Selling Entities should have known prior to both the IPO and the Secondary Offering that: (a) the Company's internal controls were severely deficient, or were disregarded, causing or allowing the Company's management to inaccurately calculate and report the amount of commissions payable to the Company's customers; (b) the Company had failed to compute and/or report the amount of commissions payable to numerous customers in accordance with the terms of those customers' contracts; (c) the Company's commission-related expense (*i.e.* its largest cost of revenues) was understated, resulting in an overstatement of earnings, gross profit margins and net income; and (d) as a result of the foregoing, the Company faced an imminent and material risk (the extent of which the Company has yet to disclose) of losing customers and making substantial additional

payments to resolve disputes over unpaid commissions, which risks threaten the Company's continued growth and viability. However, none of these material facts was disclosed to investors in the Prospectus, Registration Statement, Second Prospectus or Second Registration Statement.

**B.**    **Deloitte**

104.    Contrary to Deloitte's certification that the financial statements contained in the Second Registration Statement "present[ed] fairly, in all material respects, the financial position of Global Cash Access Holdings, Inc. and subsidiaries at December 31, 2005 and 2004, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2005, in conformity with accounting principles generally accepted in the United States of America," those financial statements were not prepared in accordance with generally accepted accounting principles ("GAAP") because the Company had not recorded expenses that should have been recorded, resulting in overstatement of key metrics, such as gross profit margins, net income, and earnings per share.

105.    Deloitte did not conduct a reasonable investigation or audit of the financial statements contained in the Second Registration Statement prior to issuing its unqualified audit report on those financial statements, or prior to allowing the inclusion of its audit report in the Second Registration Statement and Second Prospectus. As explained below, Deloitte violated several provisions of generally accepted auditing standards ("GAAS") during its audit.[2]

---

[2] The Public Company Accounting Oversight Board ("PCAOB"), which was established by the Sarbanes-Oxley Act of 2002, is responsible for the development of auditing standards that are required to be followed by all auditors for public companies. The auditing standards issued or adopted by the PCAOB, together with the auditing standards issued by the AICPA, are herein encompassed by the term "GAAS." The PCAOB and the AICPA have codified the professional auditing standards (represented herein as "AU") to ensure that audits are conducted in accordance with GAAS. *See* AU § 150.

106.    GAAS General Standard No. 3 states: "Due professional care is to be exercised in the performance of the audit and the preparation of the report." The exercise of due care includes the application of professional skepticism in lieu of mere acceptance of representations made by management. Deloitte failed to exercise due professional care and professional skepticism in the performance of its audit of the Company's 2005 financial statements, particularly with respect to the Company's commission expenses. Deloitte failed to detect widespread errors in the calculation and reporting of the Company's commission expenses, which affected the commissions paid and/or reported to at least 140 (or roughly 10%) of the Company's customers. Commission expense was the Company's single largest cost of revenue, and thus should have been closely scrutinized by Deloitte. Had Deloitte done more than accepted management's representations regarding the amount of commission expenses, such as reviewed the operative customer contracts, it would have discovered that the Company was miscalculating, misreporting and/or underpaying commissions owed to many of those customers.

107.    GAAS Standard of Fieldwork No. 3 states that "[s]ufficient competent evidential matter is to be obtained through inspection, observation, inquiries and confirmations to afford a reasonable basis for forming an opinion regarding the financial statements under audit." AU § 326, Evidential Matter, explains that the evidential matter collected and evaluated by auditors is central to a proper audit and serves as the foundation for the auditor's opinion report. Thus, Deloitte was required to investigate and obtain supporting evidential documentation for the assertions made by the Company in its financial statements, and could not merely take the word of the Company's management about the accuracy of its financial statements. As is now evident from the investigation and subsequent disclosures by the Company, Deloitte did not review the GCA's customer contracts or otherwise obtain sufficient competent evidential matter to confirm

46

that commission payments were being made and properly reported in accordance with the Company's customer contracts. Instead, Deloitte appears to have simply accepted its client's representations as to the amount of the commissions paid and payable.

108.   GAAS Standard of Fieldwork No. 2 and AU § 319 instruct auditors to obtain a sufficient understanding of a company and its internal control structure to plan an effective audit that will allow the auditor to assess the audit risk associated with inadequate internal controls. Internal controls serve as an integral way "to prevent or detect material misstatements in financial statement assertions." AU § 319.14. Although Deloitte detected certain deficiencies in the Company's internal controls during its audit of the Company's 2005 financial statements, it did not design its audit procedures to adequately assess the audit risk associated with those deficiencies. It was not until after the conclusion of the Secondary Offering that the Company and Deloitte reported that there were indeed "material weaknesses" in the Company's internal controls over financial reporting, including inadequate finance and accounting department resources and inadequate controls in the all-important area of accounting for commissions payable. These material weaknesses in internal controls existed at the time of the IPO and Secondary Offering, but Deloitte either did not detect them, or it detected them but failed to employ appropriate audit procedures to ascertain their impact on the Company's financial reporting. As a result, Deloitte did not discover the Company's failure to pay and/or record appropriate commission payments its customers, or the resulting understatement of the Company's commission expense.

109.   As a result of its failure to conduct a reasonable investigation regarding the Company's 2005 financial statements, Deloitte did not have reasonable grounds to believe that those financial statements contained no untrue statements or omissions of material fact.

C.    **The Underwriter Defendants**

110.    The Underwriter Defendants participated in the preparation and dissemination of the Prospectus, Registration Statement, Second Prospectus and Second Registration Statement, by which GCAH's stock was marketed and sold to Plaintiff and the Class.  In their capacity as underwriters of these offerings, each of the Underwriter Defendants had an obligation to conduct due diligence regarding the accuracy and completeness of these offering materials prior to their dissemination to investors and prior to consummation of the offerings.  In connection with that due diligence process, the Underwriter Defendants had access to the Company's internal non-public documents and the opportunity to talk to Company personnel.   The Underwriter Defendants were thus supposed to play a "gatekeeper" role for public investors like Plaintiff, who did not have access to non-public information through which to test the assertions in the offering documents.

111.    Had the Underwriter Defendants conducted a reasonable investigation and due diligence process, they would have learned that the Company lacked adequate internal controls in numerous respects, and in particular with regard to the calculation and payment of commissions, and that the absence of such controls had either caused or contributed to repeated miscalculations, underpayment and underreporting of commissions expense – the Company's largest cost of revenues.  A reasonable due diligence investigation would also have revealed that these commission miscalculation and misreporting issues created a severe risk – far greater and more immediate than was disclosed in the offering materials – that the Company would lose a significant amount of business and that its future survival and growth could be in doubt as customers lost trust in the Company and either terminated or failed to renew their contracts.  The Underwriter Defendants either failed to discover this information, or they discovered it but failed

to ensure that appropriate disclosures were made in the Prospectus, Registration Statement, Second Prospectus and Second Registration Statement.

## IX.    NO SAFE HARBOR

112.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the untrue statements alleged in this Complaint.  None of the statements pleaded herein are "forward-looking" statements and no such statement was identified as a "forward-looking statement" when made.  Rather, such statements all relate to facts and conditions existing at the time the statements were made.  Moreover, cautionary statements, if any, did not identify important factors that could cause actual results to differ materially from those in any putative forward-looking statements.

## X.    COUNTS

### COUNT ONE

### VIOLATION OF SECTION 11 OF THE SECURITIES ACT

### (AGAINST GCAH, THE INSIDER DEFENDANTS, THE DIRECTOR DEFENDANTS, THE UNDERWRITER DEFENDANTS, AND DELOITTE)

113.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein.  This claim is asserted pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of Plaintiff and the Class against GCAH, the Insider Defendants, the Director Defendants, the Underwriter Defendants, and Deloitte.

114.    The Registration Statement issued in connection with the IPO, and the Second Registration Statement issued in connection with the Secondary Offering, contained untrue statements of material facts and omitted to state material facts necessary to make the statements contained therein not misleading, as alleged herein.

115.    GCAH registered common stock pursuant to the Registration Statement and Second Registration Statement, which was sold to Plaintiff and the Class in the IPO and Secondary Offering, and thereafter traded in the secondary market.  All purchases of common stock during the Class Period are traceable to either the Registration Statement or the Second Registration Statement.

116.    GCAH is the registrant and issuer of the shares for the IPO and the Secondary Offering.  As such, GCAH is strictly liable to Plaintiff and the Class for the untrue statements and omissions of material fact in the Registration Statement and Second Registration Statement.

117.    Defendants Sanford, Maskatiya, Cucinotta, Kortschak, Fitzgerald, Kilburn and Harris were directors of GCAH within the meaning of Section 11(a)(2) of the Securities Act at the time of the filing of the Registration Statement and Second Registration Statement, and either personally or through an attorney-in-fact signed the Registration Statement and the Second Registration Statement within the meaning of Section 11(a)(1) of the Securities Act.

118.    Defendant Hagerty signed the Registration Statement and the Second Registration Statement within the meaning of Section 11(a)(1) of the Securities Act.

119.    Each of the Underwriter Defendants was an underwriter for the IPO within the meaning of Section 11(a)(5) of the Securities Act, and each of the Underwriter Defendants except Goldman Sachs was also an underwriter for the Secondary Offering within the meaning of Section 11(a)(5) of the Securities Act.  The Section 11 claim asserted herein against Goldman Sachs is limited to its role as an underwriter for the IPO.

120.    Deloitte is an accounting firm and auditor, involved in a profession which gives authority to the statements made by it, which has with its consent been named as having prepared or certified parts of the Second Registration Statement.  In particular, Deloitte prepared the audit

reports that are included in the Second Registration Statement, attesting, *inter alia*, that the annual consolidated financial statements contained in the Second Registration Statement were fairly presented in all material respects in accordance with GAAP and that Deloitte had conducted its audits in accordance with GAAS, when in fact those statements were untrue. Plaintiff's Section 11 claim against Deloitte is limited to the Second Registration Statement.

121. GCAH, the Insider Defendants, the Director Defendants, the Underwriter Defendants, and Deloitte each owed the Plaintiffs and the members of the Class a duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and the Second Registration Statement to ensure that the statements were true and accurate, and to ensure that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  These Defendants did not make a reasonable or diligent investigation and did not possess reasonable grounds to believe that the statements contained in the Registration Statement and the Second Registration Statement were true and that they did not omit any material facts.

122. Plaintiff and the members of the Class purchased or otherwise acquired shares that were registered pursuant to the Registration Statement and/or Second Registration Statement.  When doing so, they did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material fact in the Registration Statement and/or Second Registration Statement.

123. By virtue of the foregoing, GCAH, the Insider Defendants, the Director Defendants, the Underwriter Defendants, and Deloitte each violated Section 11 of the Securities Act.

124.    Plaintiff and the Class sustained damages as a result of the violations of Section 11 of the Securities Act alleged herein.

125.    This claim is brought within one year after the discovery of the untrue statements and omissions, and within three years after the IPO and Secondary Offering.

## COUNT TWO

### VIOLATION OF SECTION 12(A)(2) OF THE SECURITIES ACT

### (AGAINST GCAH, THE INSIDER DEFENDANTS, THE INSIDER SELLING ENTITIES, AND THE UNDERWRITER DEFENDANTS)

126.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein.  This claim is asserted pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of Plaintiff and all members of the Class who purchased GCAH stock in the IPO and/or Secondary Offering, against GCAH, the Insider Defendants, the Insider Selling Entities, and the Underwriter Defendants.

127.    The Underwriter Defendants sold GCAH common stock to Plaintiff and the Class in the IPO (including pursuant to the Underwriter Defendants' over-allotment option) and the Secondary Offering by means of the Prospectus and the Second Prospectus, respectively, by the use of means or instruments of transportation or communication in interstate commerce and/or the mails.  The Underwriter Defendants acquired title to these shares from GCAH and the selling stockholders in connection with the offerings, then passed title to those securities directly to Plaintiff and the members of the Class who purchased shares in those offerings.  All of the shares of GCAH stock that were sold in the IPO and the Secondary Offering were sold directly by the Underwriter Defendants to Plaintiff and the Class.

128.    The shares that were sold to Plaintiff and the Class in the IPO included shares that were being newly issued by GCAH and shares that were beneficially owned by the Insider Selling Entities immediately prior to the IPO.  As stated in the Prospectus, Defendant GCAH offered 9,000,000 shares in the IPO, Defendant M&C (owned by Defendants Maskatiya and Cucinotta) offered 2,774,870 shares, and Defendant Summit (whose managers included Defendants Fitzgerald and Kortschak) offered 2,504,081 shares.  GCAH, M&C, Summit, Maskatiya, Cucinotta, Fitzgerald and Kortschak each offered and actively solicited the purchase of those shares by Plaintiff and the Class, by the use of means or instruments of transportation or communication in interstate commerce or of the mails.  They did so through, *inter alia*, preparation and dissemination of the Prospectus, which identified the Insider Selling Entities as stockholders whose shares were being offered in the IPO, and which was written from the perspective of GCAH as a marketing tool to solicit investor interest in the IPO.  The Prospectus defines the term "we" to refer to "Global Cash Access Holdings Inc. together with its consolidated subsidiaries," and states:  "We are offering to sell, and seeking offers to buy, common shares … in jurisdictions where offers and sales are permitted."  Additionally, GCAH actively solicited the purchase of GCAH stock in the IPO by making presentations to investors during the road show.  Additionally, Defendants Maskatiya, Cucinotta, Fitzgerald and Kortschak solicited purchases of shares in the IPO by signing the Registration Statement.

129.    The shares that were sold to Plaintiff and the Class in the Secondary Offering included shares that were beneficially owned by the Insider Selling Entities and Defendants Sanford and Hagerty immediately prior to the Secondary Offering.  As stated in the Second Prospectus, Defendants M&C (owned by Defendants Maskatiya and Cucinotta) and Summit (whose managers included Defendants Fitzgerald and Kortschak) each offered 4,215,810 shares

for sale in the Secondary Offering, Defendant Sanford offered 300,000 shares, and Defendant Hagerty offered 100,000 shares. GCAH, M&C, Summit, Maskatiya, Cucinotta, Fitzgerald, Kortschak, Sanford and Hagerty each offered and actively solicited the purchase of those shares by Plaintiff and the Class by the use of means or instruments of transportation or communication in interstate commerce or of the mails. They did so through, *inter alia*, preparation and dissemination of the Second Registration Statement and Second Prospectus, which identified the Insider Selling Entities and Defendants Sanford and Hagerty as stockholders whose shares were being offered in the Secondary Offering, and which was written from the perspective of GCAH as a marketing tool to solicit investor interest in the Secondary Offering. The Second Prospectus defines the term "we" to refer to "Global Cash Access Holdings Inc. together with its consolidated subsidiaries," and states: "We are offering to sell, and seeking offers to buy, common shares … in jurisdictions where offers and sales are permitted." Additionally, the Insider Defendants solicited purchases of shares in the Secondary Offering by signing the Second Registration Statement.

130.    In offering and soliciting the sale of GCAH shares in the IPO and/or Secondary Offering, GCAH, the Insider Defendants, and the Insider Selling Entities were motivated at least in part by their own financial interests and those of the securities owner. Among other things: GCAH acted for the purpose of increasing investor interest in GCAH and raising capital for the benefit of the Company, and received substantial cash proceeds from the IPO; the Insider Selling Entities acted for the purpose of monetizing portions of their investments in GCAH, and they received substantial cash proceeds from both offerings; Defendants Hagerty and Sanford acted for the purpose of monetizing a portion of their own personal investments in GCAH, and received substantial cash proceeds from the Secondary Offering; and Defendants Maskatiya,

Cucinotta, Fitzgerald, and Kortschak acted for the purpose of enabling entities in which they held substantial ownership and/or managerial interests (namely, M&C and Summit) to monetize portions of their investments in GCAH in exchange for substantial cash proceeds.

131.    The Prospectus and the Second Prospectus contained untrue statements of material fact, and omitted to state material facts necessary to make the statements contained therein made not misleading, as alleged herein.

132.    GCAH, the Insider Defendants, the Insider Selling Entities and the Underwriter Defendants owed Plaintiff and the members of the Class a duty to make a reasonable and diligent investigation of the statements contained in the Prospectus and the Second Prospectus to ensure that the statements were true and accurate, and to ensure that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  These Defendants did not make a reasonable or diligent investigation and did not possess reasonable grounds to believe that the statements contained in the Prospectus or Second Prospectus were true and that they did not omit any material facts.

133.    By reasons of the conduct herein alleged, GCAH, the Insider Selling Entities, the Underwriter Defendants, and Defendants Maskatiya, Cucinotta, Fitzgerald, and Kortschak each violated Section 12(a)(2) of the Securities Act with respect to the offering, solicitation, and sale of GCAH shares in the IPO; and GCAH, the Insider Selling Entities, the Underwriter Defendants, and the Insider Defendants each violated Section 12(a)(2) of the Securities Act with respect to the offering, solicitation, and sale of GCAH shares in the Secondary Offering.

134.    Plaintiff and the Class members who purchased GCAH stock in the IPO and/or Secondary Offering did not know, nor in the exercise of reasonable diligence could they have

known, of the untrue statements of material fact or omissions of material fact in the Prospectus or the Second Prospectus.

135.    Plaintiff and the Class members who acquired shares of GCAH stock in the IPO and/or in the Secondary Offering sustained damages as a result of Defendants' violations of Section 12(a)(2) alleged herein.

136.    To the extent that Plaintiff and the Class continue to own shares of GCAH stock that they purchased in the IPO and/or Secondary Offering, they hereby tender those shares to Defendants and seek rescission of their purchases.

137.    This claim is brought within one year after the discovery of the untrue statements and omissions in the Prospectus and Second Prospectus, and within three years after the IPO and Secondary Offering.

**COUNT THREE**

**VIOLATION OF SECTION 15 OF THE SECURITIES ACT**
**BASED ON GCAH'S VIOLATIONS OF SECTION 11 & 12 OF THE SECURITIES ACT**

**(AGAINST THE INSIDER DEFENDANTS AND THE INSIDER SELLING ENTITIES)**

138.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein.  This claim is asserted against the Insider Defendants and the Insider Selling Entities.

139.    As alleged in Counts One and Two, GCAH violated Sections 11 and 12(a)(2) of the Securities Act in connection with both the IPO and the Secondary Offering, and Plaintiff and the Class suffered damage as a result of those violations.

140.    At the time of GCAH's violations of Sections 11 and 12(a)(2) of the Securities Act, the Insider Selling Entities were control persons of GCAH within the meaning of Section 15 of the Securities Act, by virtue of their beneficial ownership of a large percentage of the

Company's stock, and their actual control over (including membership on) the Company's Board of Directors. Until the date of the IPO, M&C and Summit beneficially owned approximately 75% of GCA's stock in the aggregate, with M&C owning about 40% and Summit owning 35%. From the completion of the IPO until the date of the Secondary Offering, M&C and Summit continued to retain at least 57% equity ownership of the Company, with M&C owning approximately 30% and Summit owning about 27% just prior to the Secondary Offering. At all relevant times, M&C and Summit each had two representatives on the Company's Board, comprising four members of the seven-member Board. Defendant M&C's principals, Defendants Maskatiya and Cucinotta, are also co-founders of the Company. Defendants Kortschak and Fitzgerald are principals of Summit and were both members of the Audit Committee of the Board until the consummation of the IPO, and Kortschak remained on the Audit Committee until after the Secondary Offering.

141.    The Insider Defendants also were controlling persons of GCAH at the time of GCAH's violations of Sections 11 and 12(a)(2) of the Securities Act. By virtue of their high-level positions and active participation in and/or awareness of the day-to-day operations at GCAH, each of the Insider Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company. The Insider Defendants were provided with, or had unlimited access to, copies of the Prospectus, Second Prospectus, Registration Statement and Second Registration Statement prior to their issuance and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

142.    By virtue of their high-level positions within the Company, and/or their ownership interests and actual control, the Insider Defendants and the Insider Selling Entities had access to undisclosed adverse information regarding the Company's true state of affairs vis-à-vis

the miscalculation and misreporting of commissions, lack of adequate internal controls, and their resultant effect on the Company's financial results.

143. By virtue of the Insider Defendants' and Insider Selling Entities' participation in the management and operation of the Company, and their controlling influence and authority over the Company, these Defendants were able to, and did, control the contents of the Registration Statement and Prospectus issued in connection with the IPO, and the Second Registration Statement and Second Prospectus issued in connection with the Secondary Offering.

144. The Insider Defendants and the Insider Selling Entities acted negligently and without reasonable care regarding the accuracy of the information contained in the Registration Statement, Second Registration Statement, Prospectus, and Second Prospectus. The Insider Defendants and Insider Selling Entities lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

145. Plaintiff and the Class purchased GCAH stock in the IPO and Secondary Offering. Plaintiff and the Class also purchased or otherwise acquired shares of GCAH stock in the secondary market that are traceable to the Registration Statement for the IPO and/or the Second Registration Statement for the Secondary Offering.

146. Plaintiff and the Class did not know, and in the exercise of reasonable diligence could not have known, of the inaccurate statements and omissions contained in the Registration Statement and Prospectus issued in connection with the IPO and the Second Registration Statement and Second Prospectus issued in connection with the Secondary Offering.

147. By virtue of the foregoing, the Insider Defendants and the Insider Selling Defendants are jointly and severally liable to Plaintiff and the Class under Section 15 of the Securities Act to the same extent as GCAH for GCAH's violation of Sections 11 and 12(a)(2).

148.    This claim is brought within one year after the discovery of the untrue statements and omissions, and within three years after the IPO and Secondary Offering.

## XI.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment in favor of itself and the Class, as follows:

A.    Determining this action to be a proper class action and certifying Plaintiff as a representative of the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding damages to Plaintiff and the Class pursuant to Section 11(e) of the Securities Act;

C.    Awarding rescission and/or damages in favor of Plaintiff and the Class pursuant to Section 12(a) of the Securities Act;

D.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including a reasonable allowance of fees for Plaintiff's attorneys and experts;

E.    Awarding prejudgment interest and/or opportunity cost damages in favor of Plaintiff and the Class; and

F.    Awarding Plaintiff and the Class such other and further relief as the Court may deem just and proper.

## XII.    <u>JURY DEMAND</u>

Plaintiff, on behalf of itself and the Class, hereby demands a trial by jury.

Dated: August 18, 2008

GRANT & EISENHOFER P.A.

By: *Stuart M. Grant*

Stuart M. Grant (Bar No. SG-8157)
Megan D. McIntyre
Jeff A. Almeida
485 Lexington Avenue, 29th Floor
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (646) 722-8501

*Attorneys for Lead Plaintiff and Lead
Counsel for the Class*

ABRAHAM, FRUTCHER & TWERSKY, LLP
Jeffrey S. Abraham
One Penn Plaza, Suite 2805
New York, NY 10119
Telephone: (212) 279-5050
Facsimile: (212) 279-3655

*Attorneys for Plaintiff Robert Lowinger*

# EXHIBIT 1

## CERTIFICATION OF CITY OF RICHMOND
## RETIREMENT SYSTEM IN SUPPORT OF MOTION FOR APPOINTMENT AS
## LEAD PLAINTIFF AND FOR APPROVAL OF ITS SELECTION OF COUNSEL

The undersigned, Philip R. Langham, makes this Certification pursuant to 28 U.S.C. § 1746 and 15 U.S.C. § 78u-4, and states as follows:

1.    I am the Executive Director of the City of Richmond Retirement System and am authorized to make this Certification on behalf of the City of Richmond Retirement System ("Richmond").

2.    I have reviewed the Complaint filed by Richmond against Global Cash Access Holdings, Inc. ("GCAH") and others, and have authorized its filing.

3.    I have reviewed the records of Richmond's transactions in the securities of GCAH for the proposed class period ("Class Period"). Those transactions are listed in the chart attached as Schedule A to this Certification.

4.    Richmond intends to actively monitor and vigorously pursue this action for the benefit of the class, rather than simply relying on its attorneys. Richmond has retained the law firm of Grant & Eisenhofer P.A. to represent it. This firm is knowledgeable and experienced in securities law and litigation, particularly with regard to the role and responsibilities of institutional investors in class actions.

5.    Like other investors who purchased GCAH securities during the Class Period, Richmond believes that its losses occurred as a result of the defendants' fraudulent conduct and violations of the securities laws. Richmond believes that its claims against the defendants are typical of those of other members of the class.

6.    Richmond did not purchase the securities that are the subject of the various complaints at the direction of counsel or to participate in any private action

arising under the federal securities laws. Richmond invested in GCAH solely for its own business purposes.

7.    Richmond is willing to serve as the representative party on behalf of the class of GCAH security holders who invested during the Class Period. Richmond intends to pursue this litigation for the best interests of all class members and take whatever steps are necessary regardless of geographic location.

8.    During the three-year period preceding the date of this Certification, Richmond has not served or sought to serve as a representative party for a class in an action under the federal securities laws.

9.    Richmond will not accept any payment for serving as representative party on behalf of the class beyond its *pro rata* share of any recovery, except as ordered and approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: June __6__, 2008

_____
Philip R. Langham
Executive Director
City of Richmond Retirement System

2

# SCHEDULE A

## Richmond Transactions in Global Cash

**Cusip:** 378967103
**Ticker:** GCA
**Class Period:** September 22, 2005 through November 14, 2007

| Class Period Purchases | | | | Class Period Sales | | | |
|---|---|---|---|---|---|---|---|
| Trade Date | Quantity | Price | Amount | Trade Date | Quantity | Price | Amount |
| 09/22/05 | 650 | $14.00 | $9,100 | 03/22/06 | 1,325 | $16.69 | $22,117 |
| 09/22/05 | 700 | $14.00 | $9,800 | 07/24/06 | 2,395 | $14.00 | $33,538 |
| 09/23/05 | 825 | $15.04 | $12,406 | 07/24/06 | 2,280 | $14.00 | $31,928 |
| 09/23/05 | 2,690 | $15.04 | $40,470 | 09/19/06 | 1,025 | $15.15 | $15,532 |
| 09/23/05 | 450 | $15.04 | $6,767 | 09/19/06 | 900 | $15.03 | $13,523 |
| 09/23/05 | 1,415 | $15.04 | $21,288 | 08/15/07 | 450 | $11.49 | $5,171 |
| 09/30/05 | 1,625 | $14.15 | $22,997 | 08/15/07 | 375 | $11.49 | $4,309 |
| 10/04/05 | 660 | $14.26 | $9,410 | 08/16/07 | 525 | $10.85 | $5,696 |
| 10/26/05 | 3,675 | $12.42 | $45,634 | 08/16/07 | 400 | $10.85 | $4,340 |
| 12/05/05 | 800 | $13.05 | $10,438 | 08/17/07 | 175 | $11.48 | $2,009 |
| 12/06/05 | 475 | $13.91 | $6,607 | 08/17/07 | 150 | $11.48 | $1,722 |
| 12/06/05 | 1,650 | $13.79 | $22,755 | 08/20/07 | 125 | $11.00 | $1,375 |
| 12/07/05 | 125 | $13.80 | $1,725 | 08/20/07 | 225 | $11.04 | $2,484 |
| 12/08/05 | 50 | $13.84 | $692 | 08/20/07 | 125 | $11.00 | $1,375 |
| 12/09/05 | 75 | $13.89 | $1,042 | 08/20/07 | 250 | $11.04 | $2,760 |
| 12/12/05 | 50 | $14.00 | $700 | 08/21/07 | 150 | $11.03 | $1,655 |
| 03/20/06 | 50 | $16.90 | $845 | 08/21/07 | 125 | $11.03 | $1,379 |
| 03/21/06 | 200 | $16.94 | $3,389 | 08/22/07 | 50 | $11.07 | $554 |
| 03/28/06 | 625 | $16.65 | $10,406 | 08/22/07 | 50 | $11.07 | $554 |
| 03/28/06 | 250 | $16.65 | $4,163 | 08/28/07 | 75 | $11.01 | $826 |
| 05/25/06 | 345 | $15.75 | $5,434 | 08/28/07 | 100 | $11.01 | $1,101 |
| 05/25/06 | 2,000 | $15.75 | $31,500 | 08/29/07 | 125 | $11.00 | $1,375 |
| 05/25/06 | 1,950 | $15.75 | $30,713 | 08/29/07 | 125 | $11.00 | $1,375 |
| 05/30/06 | 525 | $15.20 | $7,980 | 08/30/07 | 290 | $11.05 | $3,205 |
| 05/31/06 | 100 | $15.15 | $1,515 | 08/30/07 | 290 | $11.05 | $3,205 |
| 06/13/06 | 645 | $15.26 | $9,845 | 08/31/07 | 385 | $10.97 | $4,223 |
| 06/27/06 | 525 | $15.05 | $7,903 | 08/31/07 | 385 | $10.97 | $4,223 |
| 06/28/06 | 150 | $15.10 | $2,265 | 09/10/07 | 600 | $11.06 | $6,636 |
| 06/29/06 | 225 | $15.98 | $3,595 | 09/10/07 | 550 | $11.06 | $6,083 |
| 06/30/06 | 225 | $15.99 | $3,597 | 09/18/07 | 325 | $11.12 | $3,614 |
| 07/03/06 | 225 | $15.68 | $3,527 | 09/18/07 | 75 | $11.26 | $845 |
| 07/05/06 | 325 | $15.17 | $4,929 | 09/18/07 | 400 | $11.12 | $4,448 |
| 07/06/06 | 525 | $15.27 | $8,015 | 09/18/07 | 100 | $11.26 | $1,126 |
| 07/07/06 | 900 | $15.08 | $13,571 | 09/19/07 | 125 | $11.80 | $1,475 |
| 07/07/06 | 450 | $15.11 | $6,797 | 09/19/07 | 325 | $11.71 | $3,806 |
| 07/10/06 | 175 | $15.01 | $2,627 | 09/19/07 | 275 | $11.71 | $3,220 |
| 07/28/06 | 125 | $14.50 | $1,812 | 09/19/07 | 100 | $11.80 | $1,180 |
| 08/01/06 | 150 | $14.72 | $2,208 | 09/20/07 | 200 | $11.78 | $2,356 |
| 08/02/06 | 325 | $15.00 | $4,874 | 09/20/07 | 100 | $11.85 | $1,185 |
| 08/03/06 | 125 | $14.84 | $1,855 | 09/20/07 | 125 | $11.85 | $1,481 |
| 10/02/06 | 75 | $14.74 | $1,106 | 09/20/07 | 250 | $11.78 | $2,945 |
| 10/02/06 | 100 | $14.74 | $1,474 | 09/21/07 | 200 | $11.59 | $2,318 |
| 10/03/06 | 25 | $14.79 | $370 | 09/21/07 | 175 | $11.59 | $2,028 |
| 10/03/06 | 25 | $14.79 | $370 | 09/24/07 | 360 | $11.40 | $4,104 |
| 10/04/06 | 25 | $15.23 | $381 | 09/24/07 | 410 | $11.40 | $4,674 |
| 10/04/06 | 25 | $15.23 | $381 | 09/25/07 | 5 | $11.23 | $56 |
| 10/12/06 | 100 | $15.72 | $1,572 | 09/25/07 | 5 | $11.23 | $56 |
| 10/12/06 | 75 | $15.72 | $1,179 | 09/26/07 | 585 | $10.50 | $6,143 |
| 10/13/06 | 25 | $16.08 | $402 | 09/26/07 | 660 | $10.50 | $6,930 |
| 10/13/06 | 50 | $16.08 | $804 | 09/27/07 | 125 | $10.80 | $1,350 |
| 11/16/06 | 475 | $16.00 | $7,602 | 09/27/07 | 105 | $10.80 | $1,134 |
| 01/05/07 | 250 | $15.97 | $3,992 | 10/02/07 | 50 | $11.00 | $550 |
| 01/08/07 | 150 | $15.99 | $2,398 | 10/02/07 | 50 | $11.00 | $550 |
| 01/09/07 | 350 | $16.06 | $5,621 | 10/03/07 | 45 | $11.01 | $495 |
| 01/25/07 | 275 | $15.45 | $4,248 | 10/03/07 | 35 | $11.01 | $385 |
| 01/26/07 | 100 | $15.42 | $1,542 | 10/08/07 | 825 | $11.18 | $9,224 |

## Richmond Transactions in Global Cash

**Cusip:** 378967103
**Ticker:** GCA
**Class Period:** September 22, 2005 through November 14, 2007

| Class Period Purchases | | | |
|---|---|---|---|
| Trade Date | Quantity | Price | Amount |
| 01/29/07 | 125 | $15.64 | $1,955 |
| 01/29/07 | 225 | $15.77 | $3,548 |
| 01/29/07 | 25 | $15.77 | $394 |
| 01/30/07 | 125 | $15.95 | $1,994 |
| 01/31/07 | 150 | $15.98 | $2,398 |
| 01/31/07 | 25 | $15.98 | $400 |
| 02/01/07 | 25 | $15.98 | $399 |
| 02/01/07 | 350 | $15.98 | $5,591 |
| 02/02/07 | 175 | $16.10 | $2,817 |
| 02/02/07 | 25 | $16.10 | $402 |
| 02/05/07 | 25 | $15.99 | $400 |
| 02/05/07 | 25 | $15.97 | $399 |
| 02/05/07 | 275 | $15.99 | $4,396 |
| 02/05/07 | 275 | $15.97 | $4,392 |
| 02/06/07 | 150 | $16.12 | $2,418 |
| 02/06/07 | 25 | $16.12 | $403 |
| 02/07/07 | 100 | $16.23 | $1,623 |
| 03/26/07 | 50 | $16.19 | $810 |
| 03/26/07 | 50 | $16.19 | $810 |
| 03/27/07 | 75 | $16.31 | $1,223 |
| 03/27/07 | 575 | $16.31 | $9,376 |
| 03/27/07 | 50 | $16.31 | $815 |
| 03/27/07 | 550 | $16.31 | $8,968 |
| 03/28/07 | 125 | $16.20 | $2,025 |
| 03/28/07 | 150 | $16.20 | $2,430 |
| 03/29/07 | 275 | $16.40 | $4,509 |
| 03/29/07 | 275 | $16.40 | $4,509 |
| 03/30/07 | 375 | $16.58 | $6,218 |
| 03/30/07 | 400 | $16.58 | $6,632 |

| Class Period Sales | | | |
|---|---|---|---|
| Trade Date | Quantity | Price | Amount |
| 10/08/07 | 975 | $11.18 | $10,901 |
| 10/11/07 | 100 | $10.88 | $1,088 |
| 10/11/07 | 125 | $10.88 | $1,360 |
| 10/12/07 | 75 | $10.91 | $818 |
| 10/12/07 | 50 | $10.91 | $546 |
| 10/18/07 | 150 | $10.73 | $1,610 |
| 10/18/07 | 175 | $10.73 | $1,878 |
| 10/19/07 | 275 | $10.40 | $2,860 |
| 10/19/07 | 250 | $10.40 | $2,600 |
| 11/07/07 | 60 | $9.66 | $580 |
| 11/07/07 | 53 | $9.66 | $512 |
| 11/09/07 | 75 | $9.50 | $713 |
| 11/09/07 | 225 | $9.48 | $2,133 |
| 11/09/07 | 100 | $9.50 | $950 |
| 11/09/07 | 225 | $9.48 | $2,133 |
| 11/12/07 | 50 | $9.25 | $463 |
| 11/12/07 | 50 | $9.25 | $463 |
| 11/13/07 | 75 | $9.25 | $694 |
| 11/13/07 | 100 | $9.25 | $925 |
| 11/14/07 | 225 | $9.31 | $2,095 |
| 11/14/07 | 200 | $9.31 | $1,862 |

**Post Class Period Sales**

| Trade Date | Quantity | Price | Amount |
|---|---|---|---|
| 11/15/07 | 125 | $6.49 | $811 |
| 11/15/07 | 150 | $6.49 | $974 |
| 11/16/07 | 500 | $5.17 | $2,585 |
| 11/16/07 | 575 | $5.17 | $2,973 |
| 11/19/07 | 75 | $4.88 | $366 |
| 11/19/07 | 75 | $4.88 | $366 |
| 11/21/07 | 75 | $4.15 | $311 |
| 11/21/07 | 75 | $4.15 | $311 |
| 11/27/07 | 200 | $4.13 | $826 |
| 11/27/07 | 75 | $4.13 | $310 |
| 11/28/07 | 100 | $4.24 | $424 |
| 11/28/07 | 100 | $4.24 | $424 |
| 11/29/07 | 400 | $3.98 | $1,592 |
| 11/29/07 | 350 | $3.98 | $1,393 |
| 11/30/07 | 975 | $3.73 | $3,637 |
| 11/30/07 | 1,075 | $3.73 | $4,010 |
| 12/03/07 | 150 | $3.55 | $533 |
| 12/03/07 | 150 | $3.55 | $533 |
| 12/03/07 | 671 | $3.53 | $2,369 |
| 12/03/07 | 747 | $3.53 | $2,637 |
| 12/04/07 | 750 | $3.29 | $2,468 |
| 12/04/07 | 650 | $3.29 | $2,139 |
| 12/05/07 | 1,206 | $3.11 | $3,751 |
| 12/05/07 | 1,333 | $3.11 | $4,146 |

## CERTIFICATE OF SERVICE

I, Stuart M. Grant, hereby certify that on August 18, 2008, the foregoing

Consolidated Class Action Complaint was served upon the following counsel in the

manner listed below:

### VIA CM/ECF FILING SYSTEM:

Joel C. Haims
Morrison & Forester LLP
1290 Avenue of the Americas
New York, NY 10104

James L. Hallowell
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166

Ladan F. Stewart
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022

### VIA OVERNIGHT MAIL

Deloitte & Touche LLP
1633 Broadway
New York, NY 10019

Dated:  August 18, 2008

_Stuart M. Grant_
Stuart M. Grant